**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**NORTHERN DIVISION**

| | |
|---|---|
| **ALEXANDER WILLIAMS, SR.**<br>3908 Canterbury Way<br>Temple Hills, MD 20748<br><br>**FRANKLIN AND DOROTHY ROBINSON**<br>3612 Eyre Drive South<br>Upper Marlboro, MD 20772<br><br>**KEITH B. COOK**<br>117 Woodland Green Way<br>Aberdeen, MD 21001<br><br>**TERRY GORDON, SR.**<br>1201 NW 3rd Avenue, Apt. 808<br>Miami, FL 33136<br><br>**ROGER AND SUSAN ENOCHS**<br>2504 Windsor Road<br>Baltimore, MD 21234<br><br>*Plaintiffs*,<br><br>v.<br><br>**MARYLAND MUTUAL MORTGAGE, LLC**<br><u>Serve on:</u> Corey J. Anderson, Resident Agent<br>138 Industry Lane, Unit 2<br>Forest Hill, MD 21050<br><br>**HAWK MORTGAGE GROUP, LLC**<br><u>Serve on:</u> Jeffrey T. Hawk, Resident Agent<br>2603 Gunpowder Farms Road<br>Fallston, MD 21047<br><br>**COREY J. ANDERSON**<br>2408 Edwards Manor Drive<br>Forest Hill, MD 21050<br><br>**JEFFREY T. HAWK**<br>2603 Gunpowder Farms Road<br>Fallston, MD 21047 | Civil Action No.: |

1

## **CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiffs, Alexander Williams, Sr., Franklin and Dorothy Robinson, Keith B. Cook, Terry Gordon, Sr., and Roger and Susan Enochs, on behalf of themselves and on behalf of the entire class of persons similarly situated, by and through their attorneys, Michael Paul Smith, Melissa L. English and Sarah A. Zadrozny of Smith, Gildea & Schmidt, LLC and Timothy F. Maloney, Veronica B. Nannis and Megan Benevento of Joseph, Greenwald and Laake, P.A., file this Class Action Complaint, sue the Defendant for cause, claim damages, and state as follows:

## **INTRODUCTION**

1.  Plaintiffs Alexander Williams, Sr., Franklin and Dorothy Robinson ("Robinson Plaintiffs"), Keith B. Cook, Terry Gordon, Sr., and Roger and Susan Enochs ("Enochs Plaintiffs"), and alleged Class Members are borrowers who currently have or had a residential mortgage loan originated and/or brokered by Defendant Maryland Mutual Mortgage, LLC ("Maryland Mutual") or Hawk Mortgage Group, LLC ("Hawk Mortgage"), which was or is secured by Plaintiffs' and Class Members' residential real property.

2.  Plaintiffs and alleged Class Members are victims of an illegal kickback and price fixing scheme between Maryland Mutual, Maryland Mutual's President/Vice President Corey J. Anderson ("Anderson") and Vice President Jeffrey T. Hawk ("Hawk") (collectively, the "Maryland Mutual Defendants"), Hawk Mortgage, and Hawk Mortgage's President Hawk (collectively, the "Hawk Mortgage Defendants") and All Star Title, Inc. ("All Star"), a Maryland-based title and settlement services company.

2

3.      Under the scheme, the Maryland Mutual Defendants' and Hawk Mortgage Defendants' loan officers, agents, and/or other employees received and accepted illegal kickbacks in exchange for the assignment and referral of residential mortgage loans, refinances and reverse mortgages to All Star for title and settlement services in violation of the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. §§ 2601, *et seq.* The Maryland Mutual Defendants, the Hawk Mortgage Defendants, and All Star laundered the kickbacks through third party marketing companies to conceal the illegal kickbacks and the kickback agreement.

4.      As an essential component of the scheme, All Star conspired to and formed a cartel with various residential mortgage lenders ("All Star Lender Cartel"). The Maryland Mutual Defendants and the Hawk Mortgage Defendants participated in the All Star Lender Cartel and, in violation of Section 1 of the Sherman Act, 15 U.S.C. §§ 1, *et seq.*, entered into naked price fixing, minimum pricing and refusal to deal agreements (collectively, the "Cartel Agreements") with All Star related to the residential mortgage loans generated by All Star's illegal kickback payments to the Maryland Mutual Defendants and the Hawk Mortgage Defendants.

5.      The Maryland Mutual Defendants and the Hawk Mortgage Defendants benefitted, and upon information and belief, continue to benefit from the Cartel Agreements, because the supracompetitive prices for title and settlement services charged to Maryland Mutual and Hawk Mortgage borrowers under the Cartel Agreements were financed into the borrower's loans, and ensured the continued funding of illegal kickback payments.

6.      The Maryland Mutual Defendants, the Hawk Mortgage Defendants, and All Star continuously and regularly used the U.S. Mail and interstate wires in furtherance of the

kickback and price fixing scheme, and to identify and defraud borrowers into the All Star Scheme, willfully and intentionally engaging in a pattern of racketeering activity over a period of at least five years, in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961, *et seq.*

7.      The kickback and Cartel Agreements, and the resulting supracompetitive prices, were fraudulently concealed by the Maryland Mutual Defendants, the Hawk Mortgage Defendants, and All Star from Plaintiffs and alleged Class Members by: laundering kickbacks through third party marketing companies, creating sham invoice and payment records, fraudulent representations in marketing materials, false allocation of title and settlement fees and manipulation of the APR associated with Maryland Mutual and Hawk Mortgage loans, and false and fraudulent representations and omissions in Maryland Mutual and Hawk Mortgage borrowers' loan documents. These concealments prevented borrowers, regulators and auditors from discovering the scheme or kickback and Cartel Agreements and the injuries to Maryland Mutual and Hawk Mortgage borrowers therefrom, thereby allowing the kickbacks and supracompetitive fees to continue.

## PARTIES

8.      Plaintiffs bring this action pursuant to Federal Rule of Civil Procedure 23 as a class action on their own behalf and on behalf of the entire class of people similarly situated.

9.      Plaintiff Alexander Williams, Sr. is a resident of Prince George's County, Maryland.

10.     Plaintiffs Franklin and Dorothy Robinson are residents of Prince George's County, Maryland.

11.     Plaintiff Keith B. Cook is a resident of Harford County, Maryland.

12.     Plaintiff Terry Gordon, Sr. is a resident of Miami-Dade County, Florida.

13.     Plaintiffs Roger and Susan Enochs are residents of Baltimore County, Maryland.

14.     Defendant Maryland Mutual Mortgage, LLC is a limited liability company organized under the laws of Maryland. It is engaged in the business of consumer mortgage brokering and/or origination and/or lending and/or otherwise transacted business in the state of Maryland and in other states.

15.     Defendant Hawk Mortgage Group, LLC is a limited liability company organized under the laws of Maryland. It is engaged in the business of consumer mortgage brokering and/or origination and/or lending and/or otherwise transacted business in the state of Maryland and in other states.

16.     Defendant Corey J. Anderson is a citizen and resident of Harford County, Maryland. Anderson is, and at all relevant times was, the President/Vice President of Maryland Mutual and engaged in the brokering of residential mortgage loans in Maryland and in other states.

17.     Defendant Jeffrey T. Hawk is a citizen and resident of Harford County, Maryland. Hawk at all relevant times was the Vice President of Maryland Mutual and engaged in the brokering of residential mortgage loans in Maryland and in other states. In addition, Hawk is, and at all relevant times was, the President of Hawk Mortgage and engaged in the brokering of residential mortgage loans in Maryland and in other states.

## JURISDICTION AND VENUE

18.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1337(a), Section 4 of the Sherman Act, 15 U.S.C. § 4, and 18 U.S.C. § 1964(c).

19.     This Court has personal jurisdiction over the parties. Personal jurisdiction over the Maryland Mutual Defendants and the Hawk Mortgage Defendants is appropriate because

during the time period alleged herein Maryland Mutual, Hawk Mortgage, Anderson, and Hawk continuously transacted business within this District and engaged in an illegal price fixing agreement to fix the prices charged by All Star for settlement services that was directed at, and had the intended effect of causing injury to, persons residing in or located in this District. In addition, Maryland Mutual and Hawk Mortgage each maintain their principal place of business within this District and currently transact business within this District. In addition, both Anderson and Hawk are residents of this District.

20. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1)-(2), 15 U.S.C. § 22 and 18 U.S.C. § 1965.

## FACTUAL ALLEGATIONS FOR INDIVIDUAL AND CLASS RELIEF

21. At all relevant times, All Star is a Maryland corporation and a title and settlement service provider licensed in Maryland and regulated by the Maryland Insurance Administration. All Star is a licensed title and settlement service provider in more than 30 states, and provides title and settlement services on residential mortgage loans, refinances and reverse mortgages secured by real property in 47 states.

I. **The All Star Scheme**

    A. **All Star and Participating Lenders Pay and Receive Kickbacks in Exchange for the Assignment and Referral of Residential Mortgage Loans to All Star and Employ Several Methods to Conceal the Kickbacks.**

22. Beginning by at least 2008, All Star designs and executes a scheme ("All Star Scheme") to pay kickbacks to various mortgage lenders and their brokers, loan officers and other employees (collectively, "Participating Lenders in exchange for the Participating Lender's assignment and referral of residential mortgage loans, refinances and reverse mortgages to All Star for title and settlement services ("Kickback Agreement").

23.     All Star bases the amount of the kickback All Star paid on the number of loans the Participating Lender assigns and refers to All Star under the Kickback Agreement and the amount of profit All Star realizes on those loans.

24.     All Star pays, and Participating Lenders receive and accept, kickbacks in different forms and laundered by and through different channels.

25.     In some instances, All Star pays kickbacks by purchasing and delivering to a Participating Lender marketing materials for the Participating Lender to use in soliciting borrowers, most commonly postage to be used by a Participating Lender to send direct mail solicitations.

26.     In other instances, All Star pays cash kickbacks by checks written directly to a Participating Lender and/or their branch managers, mortgage brokers, loan officers, or other employees.  Often, a Participating Lender or its employee receives and accepts a kickback check laundered by and through a sham entity set up for the express purpose of receiving and accepting kickbacks and concealing the same.

27.     In most instances, to further conceal the kickbacks, the Participating Lenders and All Star agree to have All Star not issue a check directly to the Participating Lender and/or their branch managers, mortgage brokers, loan officers, or other employees, but instead launders the kickback payment through a third party marketing company.

28.     Participating Lenders and/or their branch managers, mortgage brokers, loan officers, or other employees frequently use third party marketing companies (such as a direct mail, data and/or leads lists, telemarketing or live transfer leads providers) to provide marketing services aimed at soliciting borrowers to obtain residential mortgage loans,

refinances and reverse mortgages, which increase the volume of loans the Participating Lender brokers or originates thereby increasing its net profit and commissions earned.

29.     All Star and Participating Lenders use a variety of third party marketing companies to launder the kickbacks. Some of these marketing companies specialize in direct mail, while others specialize in producing data and leads lists of potential borrowers for direct mail or telemarketing solicitations. Still other third party marketing companies provide Participating Lenders "live transfer" leads in which a borrower who contacts a centralized telemarketing company is transferred "live" to the Participating Lender.

30.     Under the Kickback Agreement, the Participating Lender receiving and accepting the kickback from All Star identifies a third party marketing company that the Participating Lender uses for marketing services. The third party marketing company then produces an invoice for marketing services it produces for the Participating Lender that was subject to a kickback, All Star then makes the kickback payment to the third party marketing company, and the Participating Lender receives and accepts the kickback payment when the third party marketing company applies the payment to the invoice for marketing services for the benefit of the Participating Lender.

31.     To even further conceal the kickbacks and the Kickback Agreement, All Star and the Participating Lenders request and cause the third party marketing companies to issue sham invoices that falsely identify All Star as the company purchasing and receiving the marketing services. These sham invoices create the false impression that All Star purchases and receives marketing services when in fact the payment is a kickback received and accepted by the Participating Lender in exchange for the assignment and referral of loans to All Star under the Kickback Agreement.

32.     The sham invoices conceal the fact that any thing of value is exchanged between All Star and the Participating Lender related to the loans that are assigned and referred to All Star under the Kickback Agreement.

33.     In some instances, All Star and the Participating Lender direct the third party marketing company to create and/or receive sham split invoices, of which one invoice for a portion of the amount due to the third party marketing company is sent to the Participating Lender and one invoice for the other portion of the amount due to the third party marketing company is sent to All Star.

34.     All Star and the Participating Lenders' choice to use the split invoices create the false impression that All Star purchased and received marketing services when in fact the payment is a kickback received and accepted by the Participating Lender in exchange for the assignment and referral of loans to All Star under the Kickback Agreement.  The sham split invoices also hide All Star and the Participating Lender's coordinated business relationship because there is no Participating Lender listed on the sham split invoice received and paid by All Star.

35.     In other instances, All Star and the Participating Lenders choose to conceal the kickback payment entirely by creating sham payment records. To do this, a Participating Lender directs All Star to launder a kickback through the third party marketing company without the use or issuance of any invoice.  Other times, the Participating Lender forwards to All Star an invoice addressed to the Participating Lender and All Star launder a kickback through a third party marketing company by simply referencing the Participating Lender's invoice number.

36.     All Star and Participating Lenders choose to use sham invoice and payment records to conceal the fact that payment is made by All Star as well as the fact that All Star and the Participating Lender exchanged a thing of value related to the loans that are assigned and referred to All Star under the Kickback Agreement.

37.     All Star makes clear that the kickback payments are predicated on and will continue only if the Participating Lenders meet a "unit goal" or "production" goal of loans that are assigned and referred to All Star in exchange for the kickback. *See, e.g.*, June 22, 2011 e-mail re: "unit goal" expectations, attached as **Exhibit 1**. With the laundering of kickbacks through third party marketing companies and the use of sham invoices and payment records, All Star and Participating Lenders hoped to be able to use claims of "co-marketing" as a sham and to further conceal the kickbacks and Kickback Agreement from borrowers, regulators and law enforcement.

   **B.     All Star and Participating Lenders Form a Cartel and Conspire and Agree to Fix and Charge Borrowers Higher Prices for Title and Settlement Services and Refuse to Deal with Competitors.**

38.     One of the purposes of the All Star Scheme is to allow All Star to charge borrowers higher prices for title and settlement services than is possible in a competitive market and to exclude other title and settlement service providers from the market for title and settlement services on residential mortgage loans, refinances and reverse mortgages.

39.     To achieve these purposes, All Star and Participating Lenders conspire to and form a cartel ("All Star Lender Cartel"), enter agreements and act in restraint of trade.

40.     To enforce the All Star Lender Cartel, All Star and Participating Lenders conspire and agree to fix the prices All Star charges the Participating Lender's borrowers for title and

settlement services on loans that are assigned and referred to All Star under the Kickback Agreement ("Price Fixing Agreement").

41. In addition, All Star and the Participating Lenders conspire and agree to minimum prices to charge borrowers for title and settlement services on loans that are assigned and referred to All Star under the Kickback Agreement ("Minimum Fee Agreements").

42. The Price Fixing and Minimum Fee Agreements are enforced by an agreement that the Participating Lender refuse to deal with any other title and settlement services company on those loans generated by the kickbacks ("Refusal to Deal Agreement") (collectively, with the Price Fixing and Minimum Fee Agreements, the "Cartel Agreements"), such that all loans generated by the Kickback Agreement are referred to All Star and are subject to the Price Fixing and Minimum Fee Agreements.

43. The prices All Star and the Participating Lenders fix under the Price Fixing and Minimum Fee Agreements are supracompetitive and higher than the prices that borrowers would otherwise be charged for title and settlement services in a competitive market and without the Cartel Agreements.

44. An additional purpose of the All Star Lender Cartel formed by All Star and Participating Lenders under the Kickback and Cartel Agreements is to exclude All Star's competitors from the market for title and settlement services on residential mortgage loans, refinances and reverse mortgages, and to deprive borrowers of their choice of title and settlement service provider on loans generated by the All Star funded kickbacks.

45. Participating Lenders benefit from the Cartel Agreements because: (i) the supracompetitive pricing funds the illegal kickbacks used by Participating Lenders to solicit borrowers, generate residential mortgage loans, and earn substantial interest and

commissions, and (ii) the costs for title and settlement service fees are financed into the loan and paid for by borrowers from loan proceeds such that the Participating Lender earned interest and other fees from the supracompetitive pricing.

**C.    All Star and Participating Lenders Use the U. S. Mail and Interstate Wires to Identify and Lure Borrowers into the All Star Scheme.**

46.    All Star and Participating Lenders intend the All Star Scheme to defraud borrowers into paying supracompetitive prices for title and settlement services and to thereby fund and continue the kickbacks All Star is paying Participating Lenders.

47.    In service of this intention, Participating Lenders and All Star use the kickback payments to lure borrowers into the All Star Scheme, and in turn use the interstate mails and wires to identify, solicit and lure borrowers into the All Star Scheme.

48.    Potential borrowers are identified by the third party marketing companies through which All Star and Participating Lenders are laundering the kickbacks.  Many of these third party marketing companies specialize in identifying and soliciting potential borrowers, and compiling and selling borrower sales and marketing "leads lists."

49.    Participating Lenders use these lists to solicit borrowers often through printed direct mail pieces such as postcards, letters, "SNAP packs" (mailers with perforated edges the recipient rips or "snaps" open), and other printed material that encourage borrowers to contact the Participating Lender and apply for a residential mortgage loan, refinance or reverse mortgage.

50.    All Star requires, and Participating Lenders agree, to include false representations in the Participating Lender's direct mail borrower solicitations, stating that a potential borrower would save "30-40% on title fees" by using All Star.  The purpose of these false representations is to: (i) prevent a borrower from trying to use a different title and

settlement services company for the loan, (ii) conceal the fixed, supracompetitive pricing resulting from the All Star Scheme, and (iii) create the false representation that the prices charged the borrower for title and settlement services would be lower than the prices charged by All Star competitors.

51.    Participating Lenders and All Star, by and through third party marketing companies, cause borrower data and leads list to be merged onto these direct mail solicitations, and Participating Lenders, by and through the third party marketing companies, cause these fraudulent solicitations to be sent through the interstate U.S. mails, in violation of 18 U.S.C. § 1341.

52.    All Star and Participating Lenders also obtain from third party marketing companies borrower data and leads list to solicit borrowers over the telephone, and Participating Lenders use interstate wires to make these telemarketing calls to potential borrowers in violation of 18 U.S.C. § 1343. Plaintiffs believe, and therefore aver, that All Star requires, and Participating Lenders agree, to make false representations to borrowers in these telephone solicitations similar to the false representations that All Star and Participating Lenders agree to include in direct mail solicitations.

53.    Participating Lenders also receive "live transfer" leads wherein a borrower calls a centralized call center, and then is transferred by the call center "live" to the Participating Lender. The third marketing company delivering the live transfer leads transmits the "live transfer" over interstate wires, and the Participating Lender receives the live transfer calls over interstate wires.

54.    All Star's records document that these borrower solicitation techniques lured thousands of borrowers into the All Star Scheme.

55.     All Star and Participating Lenders also administer the Kickback and Cartel Agreements over interstate wires negotiating, agreeing to and enforcing the fixed prices and refusal to deal by and through communications over interstate wires.

56.     All Star and Participating Lenders also choose to use interstate mails and wires to transmit and receive and accept illegal kickback payments and the sham invoices and payment records that conceal the kickback payments, and the Kickback and Cartel Agreements.

## II.     The Maryland Mutual Defendants' Participation in the All Star Scheme Begins by December 2009

57.     Maryland Mutual is organized in 2006 by Anderson and Hawk as Managing Members with equal membership interest.  At the time of organization, Anderson and Hawk each serve as Vice-Presidents.  In addition, both Anderson and Hawk are licensed mortgage originators employed by Maryland Mutual and operate its only office, located at 138 Industry Lane, Suite 2, Forest Hill, Maryland 21050.

58.     At all relevant times, in addition to Anderson and Hawk, Maryland Mutual's mortgage brokers and loan officers who receive and accept kickbacks are licensed mortgage brokers and/or authorized loan officers, and at all relevant times are acting within scope of the business relationship and duties of their employment on behalf of Maryland Mutual, specifically seeking borrowers and originating and securing loans for residential mortgages through Maryland Mutual and/or brokering such loans through Maryland Mutual to other lenders with whom Maryland Mutual authorizes, referring Maryland Mutual borrowers to title companies, and working with title companies to close these loans.  All activities, including interaction with All Star, are for the benefit of Maryland Mutual.

**A. The Maryland Mutual Defendants Receive Tens of Thousands of Dollars Performing the Kickback and Cartel Agreements and Charging Supracompetitive Prices to Maryland Mutual Borrowers**

59. By approximately December 2009, the Maryland Mutual Defendants, by and through Anderson and Hawk, Maryland Mutual's mortgage brokers, loan officers, and other employees, agree to accept and receive kickbacks paid by All Star in exchange for the assignment and referral of Maryland Mutual loans, refinances and reverse mortgages to All Star for title and settlement services. Maryland Mutual and All Star memorialize the Kickback Agreement and Refusal to Deal Agreement in a Dec. 1, 2009 e-mail attached as **Exhibit 2.**

60. On or about December 3, 2009, All Star pays a $4,250.00 kickback to the Maryland Mutual Defendants laundered by and through TagQuest, Inc. ("TagQuest"), an Oregon-based marketing company. The sham invoice and payment record associated with this kickback appear as **Exhibit 3**.

61. The sham invoice states that TagQuest produces and mails 10,000 Maryland Mutual solicitations to potential borrowers located in Pennsylvania, Virginia and Delaware. Plaintiffs believe, and therefore aver, that these Maryland Mutual solicitations are sent by U.S. Mail and most, if not all, are delivered interstate; that is, the Maryland Mutual solicitation is placed in the mail in one state – Oregon – and delivered to the potential borrower in another state.

62. All Star chooses to transmit the kickback payment over interstate wires in the form of a credit card authorization, with All Star e-mailing or faxing the kickback payment from All Star in Maryland and the Maryland Mutual Defendants receiving the payment, by and through TagQuest, in Oregon. *See* **Exhibit 3**.

63.     Shortly after paying this kickback, in January 2010, All Star and the Maryland Mutual Defendants conspire and agree to fix prices in relation to loans assigned and referred to All Star by the Maryland Mutual Defendants to "$395 plus title insurance, recording and CPL fee" for loans closed in Pennsylvania and "$600 plus title and recording, etc." for loans closed in Virginia and Delaware. *See* Jan. 4, 2010 Title Fee Structure Chart, attached as **Exhibit 4**.

64.     Later that month, All Star and the Maryland Mutual Defendants conspire and agree to increase the fixed price to $900 for loans closed in Virginia and Delaware, and itemizes fees for loans closed in Pennsylvania as "$395 settlement fee, $195 doc prep, $25 hand recording, $25 scanning PLUS title insurance", which maximizes the fees charged for Pennsylvania loans, where fees are regulated. *See* Jan. 21, 2010 e-mail, attached as **Exhibit 5**.

65.     About a week later, on or about January 27, 2010, All Star pays another $4,250.00 kickback to the Maryland Mutual Defendants laundered by and through TagQuest. The sham invoice and payment record associated with this kickback appear as **Exhibit 6**.

66.     The sham invoice states that TagQuest produces and mails 5,000 Maryland Mutual solicitations to potential borrowers located in Pennsylvania, Virginia and Delaware. Plaintiffs believe, and therefore aver, that these Maryland Mutual solicitations are sent by U.S. Mail and most, if not all, are delivered interstate; that is, the Maryland Mutual solicitation is placed in the mail in one state – Oregon – and delivered to the potential borrower in another state.

67.     All Star chooses to transmit the kickback payment over interstate wires in the form of a credit card authorization, with All Star e-mailing or faxing the kickback payment from

All Star in Maryland and the Maryland Mutual Defendants receiving the payment, by and through TagQuest, in Oregon. *See* **Exhibit 6**.

68.     The Maryland Mutual Defendants in fact refer loans in performance of the Kickback and Cartel Agreements. All Star refers to Maryland Mutual's "pipeline" and determines in late March that Maryland Mutual has referred enough loans to All Star at the fixed price to get another kickback. *See* Mar. 22, 2010 e-mail, attached as **Exhibit 7**.

69.     Before paying the kickback, All Star and the Maryland Mutual Defendants raise the fixed price charged for loans referred to All Star by Maryland Mutual from $950 plus title insurance to $1250 plus title insurance. All Star makes clear that the Kickback and Cartel Agreements are to impose higher prices on borrowers than the market would otherwise bear as well as to guarantee the referral of Maryland Mutual loans to All Star for title and settlement services, as the fixed prices are to "offset some of the cost from the first two mailers. The orders are there, but we just need to get some more closings." *See* **Exhibit 7**.

70.     Two days later, on or about March 24, 2010, All Star pays a $4,125.00 kickback to the Maryland Mutual Defendants laundered by and through TagQuest. The sham invoice and payment record associated with this kickback appear as **Exhibit 8**.

71.     The sham invoice states that TagQuest produces and mails 5,000 Maryland Mutual solicitations to potential borrowers located in Pennsylvania, Virginia and Delaware. Plaintiffs believe, and therefore aver, that these Maryland Mutual solicitations are sent by U.S. Mail and most, if not all, are delivered interstate; that is, the Maryland Mutual solicitation is placed in the mail in one state – Oregon – and delivered to the potential borrower in another state.

72.　All Star chooses to transmit the kickback payment over interstate wires in the form of a credit card authorization, with All Star e-mailing or faxing the kickback payment from All Star in Maryland and the Maryland Mutual Defendants receiving the payment, by and through TagQuest, in Oregon. *See* **Exhibit 8**.

73.　Two months later, on or about May 28, 2010, All Star pays a $4,095.00 kickback to the Maryland Mutual Defendants laundered by and through TagQuest. The sham invoice and payment record associated with this kickback appear as **Exhibit 9**.

74.　The sham invoice states that TagQuest produces and mails 5,000 Maryland Mutual solicitations to potential borrowers located in Pennsylvania, Virginia and Delaware. The invoices refer to Hawk and Chad Hennings, Randy White, and Kevin Gogan, licensed mortgage brokers employed by Maryland Mutual. Plaintiffs believe, and therefore aver, that these Maryland Mutual solicitations are sent by U.S. Mail and most, if not all, are delivered interstate; that is, the Maryland Mutual solicitation is placed in the mail in one state – Oregon – and delivered to the potential borrower in another state.

75.　All Star chooses to transmit the kickback payment over interstate wires in the form of a credit card authorization, with All Star e-mailing or faxing the kickback payment from All Star in Maryland and the Maryland Mutual Defendants receiving the payment, by and through TagQuest, in Oregon. *See* **Exhibit 9**.

76.　All Star and Maryland Mutual's Minimum Fee Agreement of $1250 plus title insurance is memorialized in All Star's August 3, 2010 Title Fee Structure Chart. See Aug. 3, 2010 Chart, attached as **Exhibit 10**.

77.　These prices are approximately $50-400 higher than the prices All Star is charging other Participating Lenders during this time. This Kickback Overcharge represents the

minimum amount of actual damages incurred by Maryland Mutual borrowers assigned and referred to All Star by Maryland Mutual in performance of the Kickback and Cartel Agreements and the pattern of racketeering activity All Star and the Maryland Mutual Defendants conduct in furtherance of the All Star Scheme.

78.     Approximately two months later, on or about October 7, 2010, All Star pays a $7,962.50 kickback to the Maryland Mutual Defendants laundered by and through TagQuest. The sham invoice and payment record associated with this kickback appear as **Exhibit 11**.

79.     The sham invoice states that TagQuest produces and mails a total of 20,000 Maryland Mutual solicitations to potential borrowers located in Pennsylvania, Virginia and Delaware. The invoice refers to Hawk and Eddie Sabol, Mike Wiechert, Randy White, Kevin Gogan, Chad Hennings, and Tom Landry, licensed mortgage brokers employed by Maryland Mutual. Plaintiffs believe, and therefore aver, that these Maryland Mutual solicitations are sent by U.S. Mail and most, if not all, are delivered interstate; that is, the Maryland Mutual solicitation is placed in the mail in one state – Oregon – and delivered to the potential borrower in another state.

80.     All Star chooses to transmit the kickback payment over interstate wires in the form of a credit card authorization, with All Star e-mailing or faxing the kickback payment from All Star in Maryland and the Maryland Mutual Defendants receiving the payment, by and through TagQuest, in Oregon. *See* **Exhibit 11**.

81.     That same day All Star pays the kickback, All Star and the Maryland Mutual Defendants conspire and agree to fix the prices All Star is charging Maryland Mutual borrowers for title and settlement services to a flat title fee structure of $2,000 including title insurance,

plus an additional $450 attorney fee for loans closed in Delaware ("Attorney State Surcharge"). *See* Oct. 7, 2010 e-mail, attached as **Exhibit 12**.

82. The Maryland Mutual Defendants also reiterate the Refusal to Deal, Kickback and Cartel Agreements, confirming to All Star that it is mandating that all loans received by Maryland Mutual as a result of Maryland Mutual's investment of All Star's kickback payment will be assigned and referred by Maryland Mutual Mortgage to All Star. *See* **Exhibit 12**.

83. The prices All Star is charging Maryland Mutual borrowers are approximately $200-950 higher than the prices All Star is charging other Participating Lenders during this time. This Kickback Overcharge represents the minimum amount of actual damages incurred by Maryland Mutual borrowers assigned and referred to All Star by Maryland Mutual in performance of the Kickback and Cartel Agreements and the pattern of racketeering activity All Star and the Maryland Mutual Defendants conduct in furtherance of the All Star Scheme.

84. These Price Fixing and Minimum Fee Agreements are memorialized in All Star's Title Fee Structure Chart. *See* 10/1/10 Title Fee Structure Chart and Oct. 7, 2010 e-mail updating same, attached as **Exhibit 13**.

85. The Maryland Mutual Defendants in fact assign and refer Maryland Mutual loans to All Star in performance of the Kickback and Cartel Agreements, which are tracked by All Star. *See* Dec. 2009 through Aug. 2011 Referrals Tracking Spreadsheets, collectively attached as **Exhibit 14**.

86.     On  April 20, 2011, All Star pays a $3,450.00 kickback to the Maryland Mutual Defendants laundered by and through TagQuest.  The sham invoices and payment record associated with this kickback appear as **Exhibit 15**.

87.     The sham invoice states that TagQuest produces and mails a total of 10,000 Maryland Mutual solicitations to potential borrowers located in Maryland, Pennsylvania, Virginia and Delaware.   Plaintiffs believe, and therefore aver, that these Maryland Mutual solicitations are sent by U.S. Mail and most, if not all, are delivered interstate; that is, the Maryland Mutual solicitation is placed in the mail in one state – Oregon – and delivered to the potential borrower in another state.

88.     All Star chooses to transmit the kickback payment over interstate wires, with All Star sending the kickback payment from All Star in Maryland and the Maryland Mutual Defendants receiving the payment, by and through TagQuest, in Oregon.  *See* **Exhibit 15**.

89.     After investing the kickback payment from All Star in borrower solicitations, Maryland Mutual reiterates the Kickback and Refusal to Deal Agreements, and promises to All Star "anything we bring in from the Mail Campaign you will get".  *See* Apr. 20, 2011 e-mail, attached as **Exhibit 16**.

90.     In addition, the Maryland Mutual Defendants and All Star conspire and agree to fix prices for title and settlement services for loans assigned and referred to All Star in Maryland and Virginia to $1,650 including title insurance, but keep the title charges for loans closed in Delaware at $2,000 plus a $450 attorney fee.  *See* **Exhibit 16**; *see also* 4/27/11 Title Fee Structure Chart, attached as **Exhibit 17**.

91.     These prices are approximately $50-400 higher than the prices All Star is charging other Participating Lenders during this time.  This Kickback Overcharge, plus any Attorney

State Surcharge, represents the minimum amount of actual damages incurred by Maryland Mutual borrowers assigned and referred to All Star by the Maryland Mutual Defendants in performance of the Kickback and Cartel Agreements and the pattern of racketeering activity All Star and the Maryland Mutual Defendants conduct in furtherance of the All Star Scheme.

92. The Maryland Mutual Defendants in fact continue to assign and refer Maryland Mutual loans to All Star in performance of the Kickback and Cartel Agreements, *See* **Exhibit 14**.

93. Seven months after then, on or about November 11, 2011, All Star pays a $1,737.50 kickback to the Maryland Mutual Defendants laundered by and through TagQuest. The sham invoice and payment record associated with this kickback appear as **Exhibit 18**.

94. The sham invoice states that TagQuest produces and mails a total of 5,000 Maryland Mutual solicitations to potential borrowers located in Maryland, Virginia and Delaware. Plaintiffs believe, and therefore aver, that these Maryland Mutual solicitations are sent by U.S. Mail and most, if not all, are delivered interstate; that is, the Maryland Mutual solicitation is placed in the mail in one state – Oregon – and delivered to the potential borrower in another state.

95. All Star chooses to transmit the kickback payment over interstate wires in the form of a credit card authorization, with All Star transmitting the kickback payment from All Star in Maryland and the Maryland Mutual Defendants receiving the payment, by and through TagQuest, in Oregon. *See* **Exhibit 18**.

96. All Star's records indicate that All Star and the Maryland Mutual Defendants perform the Cartel Agreements through 2012 and 2013. *See* 1/11/12 Title Fee Structure Chart, attached as **Exhibit 19**; 1/13/14 Title Fee Structure Chart, attached as **Exhibit 20**.

97.    The fixed prices All Star and the Maryland Mutual Defendants agree to and charge Maryland Mutual borrowers under the Price Fixing and Minimum Fee Agreements are approximately $50-600 higher than the prices All Star is charging other Participating Lenders during this time.  This Kickback Overcharge represents the minimum amount of actual damages incurred by Maryland Mutual borrowers assigned and referred to All Star by the Maryland Mutual Defendants in performance of the Kickback and Cartel Agreements and the pattern of racketeering activity All Star and the Maryland Mutual Defendants conduct in furtherance of the All Star Scheme.

98.    On or about May 21, 2014, All Star pays a $3,550.00 kickback to the Maryland Mutual Defendants laundered by and through TagQuest.  The sham invoice and payment record associated with this kickback appear as **Exhibit 21**.

99.    The sham invoice states that TagQuest produces and mails a total of 5,000 Maryland Mutual solicitations to potential borrowers.  Plaintiffs believe, and therefore aver, that these Maryland Mutual solicitations are sent by U.S. Mail and most, if not all, are delivered interstate; that is, the Maryland Mutual solicitation is placed in the mail in one state – Oregon – and delivered to the potential borrower in another state.

100.   All Star chooses to transmit the kickback payment over interstate wires, with All Star transmitting the kickback payment from All Star in Maryland and the Maryland Mutual Defendants receiving the payment, by and through TagQuest, in Oregon.  *See* **Exhibit 21**.

101.   Maryland Mutual and All Star perform the Kickback and Cartel Agreements through November 2015 and on information and belief, longer.  *See* **Exhibit 22**, 11/4/15 Robs Client Fee Structure Chart.

102. These fixed prices All Star and the Maryland Mutual Defendants agree to and charge Maryland Mutual borrowers in this time period are approximately $150-600 higher than the prices All Star is charging other Participating Lenders. This Kickback Overcharge represents the minimum amount of actual damages incurred by Maryland Mutual borrowers assigned and referred to All Star by the Maryland Mutual Defendants in performance of the Kickback and Cartel Agreements and the pattern of racketeering activity All Star and the Maryland Mutual Defendants conduct in furtherance of the All Star Scheme.

   B. **Hawk Leaves Maryland Mutual to Form Hawk Mortgage and Continues to Receive Thousands of Dollars Under the Kickback and Cartel Agreements**

103. In or about July 2014, Hawk leaves Maryland Mutual and organizes Hawk Mortgage with Hawk as its President. Hawk opens and operates Hawk Mortgage at 725 N. Hickory Avenue, Suite 200, Bel Air, Maryland 21014.

104. Approximately six months later, on or about January 21, 2015, All Star pays a $1,790.00 kickback to the Hawk Mortgage Defendants laundered by and through TagQuest. The sham invoice and payment record associated with this kickback appear as **Exhibit 23**.

105. The sham invoice states that TagQuest produces and mails a total of 5,000 Hawk Mortgage solicitations to potential borrowers. Plaintiffs believe, and therefore aver, that these Hawk Mortgage solicitations are sent by U.S. Mail and most, if not all, are delivered interstate; that is, the Hawk Mortgage solicitation is placed in the mail in one state – Oregon – and delivered to the potential borrower in another state.

106. All Star chooses to transmit the kickback payment over interstate wires, with All Star transmitting the kickback payment from All Star in Maryland and the Hawk Mortgage Defendants receiving the payment, by and through TagQuest, in Oregon. *See* **Exhibit 23**.

107. Days later, the Hawk Mortgage Defendants and All Star conspire and agree to fix prices in relation to loans assigned and referred to All Star by Hawk Mortgage in exchange for kickbacks on a "deal by deal" basis, with a baseline of $750 plus title. *See* Jan. 26, 2015 e-mail, attached as **Exhibit 24**.

108. The Hawk Mortgage Defendants and All Star in fact perform the Kickback and Cartel Agreements. *See* Feb. 9, 2015 e-mail, attached as **Exhibit 25** (charging borrower from mailer $850 plus title); Mar. 20, 2015 e-mail, attached as **Exhibit 26** (charging borrower from mailer $1400 including title).

109. A month and a half later, on or about March 5, 2015, All Star pays a $1,790.00 kickback to the Hawk Mortgage Defendants laundered by and through TagQuest. The sham invoice and payment record associated with this kickback appear as **Exhibit 27**.

110. The sham invoice states that TagQuest produces and mails a total of 5,000 Hawk Mortgage solicitations to potential borrowers. Plaintiffs believe, and therefore aver, that these Hawk Mortgage solicitations are sent by U.S. Mail and most, if not all, are delivered interstate; that is, the Hawk Mortgage solicitation is placed in the mail in one state – Oregon – and delivered to the potential borrower in another state.

111. All Star chooses to transmit the kickback payment over interstate wires, with All Star transmitting the kickback payment from All Star in Maryland and the Hawk Mortgage Defendants receiving the payment, by and through TagQuest, in Oregon. *See* **Exhibit 27**.

112. The Hawk Mortgage Defendants continue to assign and refer loans to All Star in performance of the Kickback and Cartel Agreements. *See* Apr. 28, 2015 e-mail, attached as **Exhibit 28**

113.    That same day, on or about April 28, 2015, All Star pays a $1,790.00 kickback to the Hawk Mortgage Defendants laundered by and through TagQuest.  The sham invoice and payment record associated with this kickback appear as **Exhibit 29**.

114.    The sham invoice states that TagQuest produces and mails a total of 5,000 Hawk Mortgage solicitations to potential borrowers.  Plaintiffs believe, and therefore aver, that these Hawk Mortgage solicitations are sent by U.S. Mail and most, if not all, are delivered interstate; that is, the Hawk Mortgage solicitation is placed in the mail in one state – Oregon – and delivered to the potential borrower in another state.

115.    All Star chooses to transmit the kickback payment over interstate wires, with All Star transmitting the kickback payment from All Star in Maryland and the Hawk Mortgage Defendants receiving the payment, by and through TagQuest, in Oregon.  *See* **Exhibit 29**.

116.    A month and a half later, on or about June 17, 2015, All Star pays another $1,790.00 kickback to the Hawk Mortgage Defendants laundered by and through TagQuest.  The sham invoice associated with this kickback appears as **Exhibit 30**.

117.    The sham invoice states that TagQuest produces and mails a total of 5,000 Hawk Mortgage solicitations to potential borrowers.  Plaintiffs believe, and therefore aver, that these Hawk Mortgage solicitations are sent by U.S. Mail and most, if not all, are delivered interstate; that is, the Hawk Mortgage solicitation is placed in the mail in one state – Oregon – and delivered to the potential borrower in another state.

118.    Again, a month and a half later, on or about August 7, 2015, All Star pays a $1,790.00 kickback to Hawk Mortgage laundered by and through TagQuest.  The sham invoice associated with this kickback appears as **Exhibit 31**.

119. The sham invoice states that TagQuest produces and mails a total of 5,000 Hawk Mortgage solicitations to potential borrowers. Plaintiffs believe, and therefore aver, that these Hawk Mortgage solicitations are sent by U.S. Mail and most, if not all, are delivered interstate; that is, the Hawk Mortgage solicitation is placed in the mail in one state – Oregon – and delivered to the potential borrower in another state.

120. Approximately three months later, on or about November 10, 2015, All Star pays a $1,790.00 kickback to the Hawk Mortgage Defendants laundered by and through TagQuest. The sham invoice and payment record associated with this kickback appear as **Exhibit 32**.

121. The sham invoice states that TagQuest produces and mails a total of 5,000 Hawk Mortgage solicitations to potential borrowers. Plaintiffs believe, and therefore aver, that these Hawk Mortgage solicitations are sent by U.S. Mail and most, if not all, are delivered interstate; that is, the Hawk Mortgage solicitation is placed in the mail in one state – Oregon – and delivered to the potential borrower in another state.

122. All Star chooses to transmit the kickback payment over interstate wires in the form of a credit card authorization, with All Star transmitting the kickback payment from All Star in Maryland and the Hawk Mortgage Defendants receiving the payment, by and through TagQuest, in Oregon. *See* **Exhibit 32**.

123. The Hawk Mortgage Defendants and All Star perform the Kickback and Cartel Agreements through November 2015 and on information and belief, longer. *See* **Exhibit 22**, Nov. 4, 2015 Robs Client Fee Structure Chart.

124. These prices are approximately $150-850 higher than the prices All Star is charging other Participating Lenders during this time. This Kickback Overcharge, represents the

27

minimum amount of actual damages incurred by Hawk Mortgage borrowers assigned and referred to All Star by the Hawk Mortgage Defendants in performance of the Kickback and Cartel Agreements and the pattern of racketeering activity All Star and the Hawk Mortgage Defendants conduct in furtherance of the All Star Scheme.

125. The Maryland Mutual Defendants and the Hawk Mortgage Defendants assign and refer more than 400 loans to All Star involving residential mortgage loans, refinances or reverse mortgages secured by real property across four states.

126. Based on the continuing pattern of practice between All Star, the Maryland Mutual Defendants and the Hawk Mortgage Defendants, Plaintiffs believe, and therefore aver, that All Star, the Maryland Mutual Defendants, and the Hawk Mortgage Defendants conspire to and fix prices for title and settlement services associated with loans assigned and referred to All Star by additional known and unknown Maryland Mutual and Hawk Mortgage loan officers in furtherance and performance of the Kickback and Cartel Agreements.

127. Based on the continuing pattern of practice between All Star, the Maryland Mutual Defendants, and the Hawk Mortgage Defendants, Plaintiffs believe, and therefore aver, that All Star pays kickbacks to the Maryland Mutual Defendants and the Hawk Mortgage Defendants by and through other third party marketing companies in addition to those identified herein.

128. As a result of the Maryland Mutual Defendants' and the Hawk Mortgage Defendants' performance of the Kickback and Cartel Agreements and the pattern of racketeering activity All Star, the Maryland Mutual Defendants, and the Hawk Mortgage Defendants conduct in furtherance of the All Star Scheme, Maryland Mutual and Hawk Mortgage

borrowers, including Plaintiffs and alleged Class Members, are harmed because they are defrauded into being charged and paying higher and supracompetitive prices for title and settlement services than they would have been charged and paid without the Kickback and Cartel Agreements, are denied kickback free title and settlement services, and were denied their choice of title and settlement service provider and other consumer benefits of a competitive marketplace.

129. No title services are provided by Maryland Mutual or Hawk Mortgage, or any Maryland Mutual or Hawk Mortgage employee and/or agent, associated with the receipt and acceptance of the kickbacks. The payment by All Star and the receipt and acceptance by the Maryland Mutual Defendants and the Hawk Mortgage Defendants of the kickbacks are made solely for the assignment and referral of Maryland Mutual and Hawk Mortgage borrowers to All Star.

### FACTUAL ALLEGATIONS RELATED TO
### THE INDIVIDUAL CLASS REPRESENTATIVES

130. Plaintiffs' transactions and the course of events thereafter exemplify the working of the Kickback and Cartel Agreements and are typical of all alleged Class Members' transactions.

**A. Alexander Williams, Sr.'s Loan**

131. In or about February 2012, Plaintiff Alexander Williams, Sr. obtains a residential mortgage loan brokered by Maryland Mutual through Eddie Sabol ("Sabol"), a loan officer employed by Maryland Mutual, in relation to the refinancing of his residential real property and principal residence located at 3908 Canterbury Way, Temple Hills, MD 20748. Plaintiff Williams' loan settles on February 15, 2012 with Freedom Mortgage Corporation as the lender.

132.　Sabol assigned and referred Plaintiff Williams' loan to All Star in performance of the Refusal to Deal Agreement and as quid pro quo for the $1,737.50 kickback All Star pay and the Maryland Mutual Defendants receive and accept on or about November 11, 2011 laundered by and through TagQuest, thereby performing the Kickback and Cartel Agreements, depriving Plaintiff Williams of his choice of title and settlement service provider, and denying Plaintiff Williams kickback-free title and settlement services.

133.　All Star charges Plaintiff Williams $1,350.00 for title and settlement service fees, thereby performing the Price Fixing and Minimum Fee Agreements.　See Plaintiff Williams' HUD-1, attached as **Exhibit 33**.

134.　Plaintiff Williams believes, and therefore avers, the price for title and settlement service fees All Star charges Plaintiff Williams is supracompetitive and higher than the same charges would have been without the Kickback and Cartel Agreements and the pattern of racketeering activity All Star, the Maryland Mutual Defendants, and the Hawk Mortgage Defendants perform in furtherance of the All Star Scheme.

135.　These title and settlement service fees include the approximately $300 Kickback Overcharge described in ¶¶ 95-96, which is the minimum amount of Plaintiff Williams' actual damages resulting from the All Star Scheme and Cartel Agreements and the pattern of racketeering activity All Star, the Maryland Mutual Defendants, and the Hawk Mortgage Defendants perform in furtherance of the All Star Scheme.

136.　Plaintiff Williams believes, and therefore avers, that he paid for these charges when All Star disbursed proceeds from Plaintiff Williams' loan in payment of these title and settlement service charges.

137. As a direct and proximate result of the Kickback and Cartel Agreements and the pattern of racketeering activity All Star, the Maryland Mutual Defendants, and the Hawk Mortgage Defendants perform in furtherance of the All Star Scheme, Plaintiff Williams was harmed because he was: (i) charged and paid more for settlement services than he would have paid without the illegal Kickback and Cartel Agreements and the pattern of racketeering activity All Star, the Maryland Mutual Defendants, and the Hawk Mortgage Defendants perform in furtherance of the All Star Scheme; (ii) was defrauded into being charged and paying supracompetitive prices for title and settlement service fees; (iii) stripped of his choice of title and settlement service provider and his mortgage broker's impartial evaluation of All Star's service and quality; and (iv) deprived of kickback-free title and settlement services and the consumer benefits of fair competition among independent title and settlement service providers.

138. As a direct and proximate result of the Kickback and Cartel Agreements and the pattern of racketeering activity All Star, the Maryland Mutual Defendants, and the Hawk Mortgage Defendants perform in furtherance of the All Star Scheme, Plaintiff Williams was charged and paid more for the title and settlement services than he would have paid without the Kickback and Cartel Agreements and the pattern of racketeering activity All Star, the Maryland Mutual Defendants, and the Hawk Mortgage Defendants perform in furtherance of the All Star Scheme, and suffered actual damages in the amount of at least $300 and, on information and belief, additional amounts.

**B. The Robinson Plaintiffs' Loan**

139. In or about June 2012, Plaintiffs Franklin and Dorothy Robinson obtain a residential mortgage loan brokered by Maryland Mutual through Sabol, a loan officer employed by

Maryland Mutual, in relation to the refinance of their residential real property and principal residence located at 3612 Eyre Drive South, Upper Marlboro, MD 20772. The Robinson Plaintiffs' loan settles on June 25, 2012 with Platinum Mortgage, Inc. as the lender.

140.     The Robinson Plaintiffs believe, and therefore aver, that Sabol assigned and referred the Robinson Plaintiffs' loan to All Star in performance of the Kickback and Cartel Agreements, depriving the Robinson Plaintiffs of their choice of title and settlement service provider, and denying the Robinson Plaintiffs kickback-free title and settlement services.

141.     All Star charges the Robinson Plaintiffs for title and settlement services, thereby performing the Price Fixing and Minimum Fee Agreements.

142.     The Robinson Plaintiffs believe, and therefore aver, that the price for title and settlement service fees All Star charges the Robinson Plaintiffs are supracompetitive and higher than the same charges would have been without the Kickback and Cartel Agreements and the pattern of racketeering activity All Star, the Maryland Mutual Defendants, and the Hawk Mortgage Defendants perform in furtherance of the All Star Scheme.

143.     These title and settlement service fees include the approximately $50-600 Kickback Overcharge described in ¶¶ 95-96, which is the minimum amount of the Robinson Plaintiffs' actual damages resulting from the All Star Scheme and Cartel Agreements and the pattern of racketeering activity All Star, the Maryland Mutual Defendants, and the Hawk Mortgage Defendants perform in furtherance of the All Star Scheme.

144.   The Robinson Plaintiffs believe, and therefore aver, that they paid for these charges when All Star disbursed proceeds from the Robinson Plaintiffs' loan in payment of these title and settlement service charges.

145.   As a direct and proximate result of the Kickback and Cartel Agreements and the pattern of racketeering activity All Star, the Maryland Mutual Defendants, and the Hawk Mortgage Defendants perform in furtherance of the All Star Scheme, the Robinson Plaintiffs were harmed because they were: (i) charged and paid more for settlement services than they would have paid without the illegal Kickback and Cartel Agreements and the pattern of racketeering activity All Star, the Maryland Mutual Defendants, and the Hawk Mortgage Defendants perform in furtherance of the All Star Scheme; (ii) were defrauded into being charged and paying supracompetitive prices for title and settlements service fees; (iii) stripped of their choice of title and settlement service provider and their mortgage broker's impartial evaluation of All Star's service and quality; and (iv) deprived of kickback-free title and settlement services and the consumer benefits of fair competition among independent title and settlement service providers.

146.   As a direct and proximate result of the Kickback and Cartel Agreements and the pattern of racketeering activity All Star, the Maryland Mutual Defendants, and the Hawk Mortgage Defendants perform in furtherance of the All Star Scheme, the Robinson Plaintiffs were charged and paid more for the title and settlement services than they would have paid without the Kickback and Cartel Agreements and the pattern of racketeering activity All Star, the Maryland Mutual Defendants, and the Hawk Mortgage Defendants perform in furtherance of the All Star Scheme, and suffered actual damages in the amount of at least $50-600 and, on information and belief, additional amounts.

### C.      Keith Cook's Loan

147.    In or about May 2015, Plaintiff Keith B. Cook obtains a residential mortgage loan brokered by Maryland Mutual through EJ Anderson ("Anderson"), a loan officer employed by Maryland Mutual, in relation to the refinance of his residential real property and principal residence located at 117 Woodland Green Way, Aberdeen, MD 21001. Plaintiff Cook's loan settles on May 18, 2015 with Century Lending Company as the lender.

148.    Plaintiff Cook believes, and therefore avers, that Anderson assigns and refers Plaintiff Cook's loan to All Star in performance of the Kickback and Cartel Agreements, depriving Plaintiff Cook of his choice of title and settlement service provider, and denying Plaintiff Cook kickback-free title and settlement services.

149.    All Star charges Plaintiff Cook for title and settlement services, thereby performing the Price Fixing and Minimum Fee Agreements.

150.    Plaintiff Cook believes, and therefore avers, that the price for title and settlement service fees All Star charges Plaintiff Cook are supracompetitive and higher than the same charges would have been without the Kickback and Cartel Agreements and the pattern of racketeering activity All Star, the Maryland Mutual Defendants, and the Hawk Mortgage Defendants perform in furtherance of the All Star Scheme.

151.    These title and settlement service fees include the approximately $50-600 Kickback Overcharge described in ¶¶ 95-96, which is the minimum amount of Plaintiff Cook's actual damages resulting from the All Star Scheme and Cartel Agreements and the pattern of racketeering activity All Star, the Maryland Mutual Defendants, and the Hawk Mortgage Defendants perform in furtherance of the All Star Scheme.

152. Plaintiff Cook believes, and therefore avers, that he paid for these charges when All Star disbursed proceeds from Plaintiff Cook's loan in payment of these title and settlement service charges.

153. As a direct and proximate result of the Kickback and Cartel Agreements and the pattern of racketeering activity All Star, the Maryland Mutual Defendants, and the Hawk Mortgage Defendants perform in furtherance of the All Star Scheme, Plaintiff Cook was harmed because he was: (i) charged and paid more for settlement services than he would have paid without the illegal Kickback and Cartel Agreements and the pattern of racketeering activity All Star, the Maryland Mutual Defendants, and the Hawk Mortgage Defendants perform in furtherance of the All Star Scheme; (ii) was defrauded into being charged and paying supracompetitive prices for title and settlements service fees; (iii) stripped of his choice of title and settlement service provider and his mortgage broker's impartial evaluation of All Star's service and quality; and (iv) deprived of kickback-free title and settlement services and the consumer benefits of fair competition among independent title and settlement service providers.

154. As a direct and proximate result of the Kickback and Cartel Agreements and the pattern of racketeering activity All Star, the Maryland Mutual Defendants, and the Hawk Mortgage Defendants perform in furtherance of the All Star Scheme, Plaintiff Cook was charged and paid more for the title and settlement services than he would have paid without the Kickback and Cartel Agreements and the pattern of racketeering activity All Star, the Maryland Mutual Defendants, and the Hawk Mortgage Defendants perform in furtherance of the All Star Scheme, and suffered actual damages in the amount of at least $50-600 and, on information and belief, additional amounts.

## D. Terry Gordon, Sr.'s Loan

155. In or about May 2015, Plaintiff Terry Gordon, Sr. obtains a residential mortgage loan brokered by Maryland Mutual through Paul Stromberger ("Stromberger"), a loan officer employed by Maryland Mutual, in relation to the refinance of his residential real property and principal residence located at 16208 Dawn Chorus Lane, Brandywine, MD 20613. Plaintiff Gordon's loan settles on May 22, 2015 with Mortgage Solutions of Colorado, LLC as the lender.

156. Plaintiff Gordon believes, and therefore avers, that Stromberger assigns and refers Plaintiff Gordon's loan to All Star in performance of the Kickback and Cartel Agreements, depriving Plaintiff Gordon of his choice of title and settlement service provider, and denying Plaintiff Gordon kickback-free title and settlement services.

157. All Star charges Plaintiff Gordon $1,530.75 for title and settlement service fees, thereby performing the Price Fixing and Minimum Fee Agreements. *See* Plaintiff Gordon's HUD-1, attached as **Exhibit 34**.

158. Plaintiff Gordon believes, and therefore avers, that the price for title and settlement service fees All Star charges Plaintiff Gordon are supracompetitive and higher than the same charges would have been without the Kickback and Cartel Agreements and the pattern of racketeering activity All Star, the Maryland Mutual Defendants, and the Hawk Mortgage Defendants perform in furtherance of the All Star Scheme.

159. These title and settlement service fees include the approximately $480.75 Kickback Overcharge described in ¶¶ 95-96, which is the minimum amount of Plaintiff Gordon's actual damages resulting from the All Star Scheme and Cartel Agreements and the

pattern of racketeering activity All Star, the Maryland Mutual Defendants, and the Hawk Mortgage Defendants perform in furtherance of the All Star Scheme.

160. Plaintiff Gordon believes, and therefore avers, that he paid for these charges when All Star disbursed proceeds from Plaintiff Gordon's loan in payment of these title and settlement service charges.

161. As a direct and proximate result of the Kickback and Cartel Agreements and the pattern of racketeering activity All Star, the Maryland Mutual Defendants, and the Hawk Mortgage Defendants perform in furtherance of the All Star Scheme, Plaintiff Gordon was harmed because he was: (i) charged and paid more for settlement services than he would have paid without the illegal Kickback and Cartel Agreements and the pattern of racketeering activity All Star, the Maryland Mutual Defendants, and the Hawk Mortgage Defendants perform in furtherance of the All Star Scheme; (ii) was defrauded into being charged and paying supracompetitive prices for title and settlements service fees; (iii) stripped of his choice of title and settlement service provider and his mortgage broker's impartial evaluation of All Star's service and quality; and (iv) deprived of kickback-free title and settlement services and the consumer benefits of fair competition among independent title and settlement service providers.

162. As a direct and proximate result of the Kickback and Cartel Agreements and the pattern of racketeering activity All Star, the Maryland Mutual Defendants, and the Hawk Mortgage Defendants perform in furtherance of the All Star Scheme, Plaintiff Gordon was charged and paid more for the title and settlement services than he would have paid without the Kickback and Cartel Agreements and the pattern of racketeering activity All Star, the Maryland Mutual Defendants, and the Hawk Mortgage Defendants perform in

furtherance of the All Star Scheme, and suffered actual damages in the amount of at least $480.75 and, on information and belief, additional amounts.

**E.    The Enochs Plaintiffs' Loan**

163.   In or about September 2015, Plaintiffs Roger and Susan Enochs obtain a residential mortgage loan brokered by Hawk Mortgage through Mike Wiechert ("Wiechert"), a loan officer employed by Hawk Mortgage, in relation to the refinance of their residential real property and principal residence located at 2504 Windsor Road, Baltimore, MD 21234. The Enochs Plaintiffs' loan settles on September 18, 2015 with Century Lending Company as the lender.

164.   The Enochs Plaintiffs believe, and therefore aver, that Wiechert assigned and referred the Enochs Plaintiffs' loan to All Star in exchange for the $1,790.00 kickback paid to the Hawk Mortgage Defendants on or about June 17, 2015 laundered by and through TagQuest and described in ¶¶ 116-117, in performance of the Kickback and Cartel Agreements, depriving the Enochs Plaintiffs of their choice of title and settlement service provider, and denying the Enochs Plaintiffs kickback-free title and settlement services.

165.   All Star charges the Enochs Plaintiffs for title and settlement services, thereby performing the Price Fixing and Minimum Fee Agreements.

166.   The Enochs Plaintiffs believe, and therefore aver, that the price for title and settlement service fees All Star charges the Enochs Plaintiffs are supracompetitive and higher than the same charges would have been without the Kickback and Cartel Agreements and the pattern of racketeering activity All Star, the Maryland Mutual Defendants, and the Hawk Mortgage Defendants perform in furtherance of the All Star Scheme.

167. These title and settlement service fees include the approximately $150-600 Kickback Overcharge described in ¶¶ 107-108, which is the minimum amount of the Enochs Plaintiffs' actual damages resulting from the All Star Scheme and Cartel Agreements and the pattern of racketeering activity All Star, the Maryland Mutual Defendants, and the Hawk Mortgage Defendants perform in furtherance of the All Star Scheme.

168. The Enochs Plaintiffs believe, and therefore aver, that they paid for these charges when All Star disbursed proceeds from the Enochs Plaintiffs' loan in payment of these title and settlement service charges.

169. As a direct and proximate result of the Kickback and Cartel Agreements and the pattern of racketeering activity All Star, the Maryland Mutual Defendants, and the Hawk Mortgage Defendants perform in furtherance of the All Star Scheme, the Enochs Plaintiffs were harmed because they were: (i) charged and paid more for settlement services than they would have paid without the illegal Kickback and Cartel Agreements and the pattern of racketeering activity All Star, the Maryland Mutual Defendants, and the Hawk Mortgage Defendants perform in furtherance of the All Star Scheme; (ii) were defrauded into being charged and paying supracompetitive prices for title and settlements service fees; (iii) stripped of their choice of title and settlement service provider and their mortgage broker's impartial evaluation of All Star's service and quality; and (iv) deprived of kickback-free title and settlement services and the consumer benefits of fair competition among independent title and settlement service providers.

170. As a direct and proximate result of the Kickback and Cartel Agreements and the pattern of racketeering activity All Star, the Maryland Mutual Defendants, and the Hawk Mortgage Defendants perform in furtherance of the All Star Scheme, the Enochs

Plaintiffs were charged and paid more for the title and settlement services than they would have paid without the Kickback and Cartel Agreements and the pattern of racketeering activity All Star, the Maryland Mutual Defendants, and the Hawk Mortgage Defendants perform in furtherance of the All Star Scheme, and suffered actual damages in the amount of at least $150-600 and, on information and belief, additional amounts.

### FACTUAL ALLEGATIONS RELATED TO LIMITATIONS

171. Essential to the All Star Scheme, the Maryland Mutual Defendants and the Hawk Mortgage Defendants, as well as other members of the All Star Lender Cartel, and All Star undertake affirmative acts that fraudulently conceal the Kickback and Cartel Agreements, the resulting kickbacks and fixed prices, and the actual injury and damages to borrowers, including Plaintiffs and alleged Class Members.

I. **All Star, the Maryland Mutual Defendants and the Hawk Mortgage Defendants Launder Kickbacks through Third Party Marketing Companies and Use Sham Invoice and Payment Records.**

172. As described in ¶ 27 above, the Maryland Mutual Defendants, the Hawk Mortgage Defendants, and All Star chose to conceal the fact and payment of kickbacks by laundering kickbacks through third party marketing companies.

173. As described in ¶¶ 30-36, the Maryland Mutual Defendants, the Hawk Mortgage Defendants, and All Star further chose to conceal the illegal kickbacks and the Kickback and Cartel Agreements through the creation of sham invoices and sham payment records.

174. These sham invoices and payment records create an ongoing false record that conceals and prevents discovery of the fact that any thing of value is exchanged between the Maryland Mutual Defendants or the Hawk Mortgage Defendants and All Star related to the assignment and referral of Maryland Mutual and Hawk Mortgage loans, including

Plaintiffs' loans, the actual payment and receipt and acceptance of illegal kickbacks, and the Maryland Mutual Defendants' and the Hawk Mortgage Defendants' coordinated business relationships with All Star.

II.     **The Maryland Mutual Defendants, the Hawk Mortgage Defendants, and All Star's Fraudulent Marketing Representations**

175.    To further conceal the Price Fixing, Minimum Fee Agreements, the Kickback and Cartel Agreements, and the resulting supracompetitive prices charged to Maryland Mutual and Hawk Mortgage borrowers for title and settlement services, the Maryland Mutual Defendants, the Hawk Mortgage Defendants, and All Star make false representations to borrowers in marketing materials.

176.    In direct mail solicitations of borrowers, Maryland Mutual and Hawk Mortgage represent that a borrower can "Save 30-40% on your title fees by choosing All Star Title" and that All Star is Maryland Mutual and Hawk Mortgage's "Preferred Title Partner" *See, e.g.*, 2011 mailer, attached as **Exhibit 35**.

177.    These representations are false because: (i)  a borrower can not save any percentage of title fees with All Star, but instead is charged higher and supracompetitive fees under the Cartel Agreements and to fund the pattern of racketeering activity All Star, the Maryland Mutual Defendants, and the Hawk Mortgage Defendants perform in furtherance of the All Star Scheme; (ii) the reason the Maryland Mutual and/or Hawk Mortgage broker wants a borrower to use All Star is for the Maryland Mutual Defendants and the Hawk Mortgage Defendants to obtain kickbacks and perform its obligations under the Cartel Agreements and to fund the pattern of racketeering activity All Star, the Maryland Mutual Defendants, and the Hawk Mortgage Defendants perform in furtherance of the All Star Scheme, not because the borrower will receive lower fees; and (iii) any borrower

responding to the direct mail solicitation does not "choose" All Star, but will be assigned and referred by the Maryland Mutual Defendants or the Hawk Mortgage Defendants to All Star.

**III.    The Maryland Mutual Defendants, the Hawk Mortgage Defendants, and All Star's False Allocation of Fees and APR Manipulation**

178.    The Truth in Lending Act ("TILA") mandates that lenders report to borrowers the Annual Percentage Rate, or "APR", associated with a loan, refinance, or reverse mortgage. While the interest rate of a loan is the cost to borrow the principal loan amount, the APR includes both the interest rate of the loan plus certain other lender fees, such as origination fees, discount points and some closing costs, including some title and settlement service fees. The APR is intended as a tool for borrowers to compare, among other things, closing and settlement costs across loans with similar interest rates and to easily identify when one loan has substantially higher fees than another loan at the same interest rate. Lenders are required to report to borrowers a calculation of the APR on various loan documents, including the TILA disclosure.

179.    The title and settlement service fees that are excluded in the APR calculation are defined by TILA. 12 C.F.R. § 1026.4(c). Because some fees are excluded from the APR (and others are not), title and settlement service companies and lenders can manipulate – and falsely minimize – the APR by falsely allocating amounts charged for title and settlement services to those categories of fees that are excluded from the APR calculation.

180.    As a regular and continuing business practice, the Maryland Mutual Defendants, the Hawk Mortgage Defendants, and All Star allocate the charges for title and settlement services associated with a borrower's loan only to those categories of title services not

included in the APR, thereby falsely minimizing the APR reported on Maryland Mutual and Hawk Mortgage borrowers' loan documents and required federal disclosures.

181.   For example, "fees for title examination, abstract of title, [and] title insurance" are excluded from the APR calculation – *see* 12 C.F.R. § 1026.4(c)(7)(i) – while a settlement or closing fee and an application signing fee are settlement service costs required to be included in the APR calculation.  *See* 12 C.F.R. § 1026.4(a)(1)(i). By allocating the charges associated to conducting a settlement or closing with a borrower to the category of "title exam" or "abstract" the result would be a false, and falsely minimized, APR.

182.   All Star claims the false allocation of fees and manipulation of the APR as a regular business practice as early as 2011 and at least through October, 2015, allocating all charges for title and settlement service to "Title Exam" or "Abstract" because those fees are excluded from, and do not raise, the APR.  *See, e.g.*, June 6, 2011 E-mail, attached as **Exhibit 36**; September 24, 2015 E-mail, attached as **Exhibit 37**; October 6, 2015 E-mail, attached as **Exhibit 38**.

183.    The Maryland Mutual Defendants and the Hawk Mortgage Defendants participate in and ratify this false allocation of fees.  *See* Dec. 16, 2011 Maryland Mutual e-mail, attached as **Exhibit 39** and Nov. 30, 2015 Hawk Mortgage e-mail, attached as **Exhibit 40**. Based on this continuing pattern of practice, Plaintiffs believe, and therefore aver, that All Star, the Maryland Mutual Defendants, and the Hawk Mortgage Defendants engage in the false allocation and manipulation of the APR throughout the time period the Maryland Mutual Defendants and the Hawk Mortgage Defendants are participating in the All Star Scheme.

184.	For example, despite conducting a settlement or closing with each Maryland Mutual and Hawk Mortgage borrower, All Star, the Maryland Mutual Defendants, and the Hawk Mortgage Defendants choose to not allocate any amount of All Star's charges associated with a borrower's loan to "settlement or closing fee" because that charge is included in the APR. Instead, All Star, the Maryland Mutual Defendants, and the Hawk Mortgage Defendants allocate all charges, including that portion attributable to conducting a settlement or closing, to "Title Exam" or "Abstract", which are excluded from the APR. *See* **Exhibit 39**.

185.	The Maryland Mutual Defendants, the Hawk Mortgage Defendants, and All Star's choice to falsely allocate fees resulted in the fraudulent reporting of false APR's and the false, and falsely minimized, representation of the cost of the loan to the Maryland Mutual and Hawk Mortgage borrower.

186.	The Maryland Mutual Defendants, the Hawk Mortgage Defendants, and All Star's choice to falsely allocate fees and fraudulently report these false allocations in borrowers' loan documents concealed from Maryland Mutual and Hawk Mortgage borrowers the supracompetitive pricing of title and settlement services resulting from the Kickback and Cartel Agreements and prevented borrowers from discovering the supracompetitive nature of the pricing through comparison to Maryland Mutual's, Hawk Mortgage's, and All Star's competitors.

187.	As a regular business practice, All Star used various software programs, including "Titlehound", to produce borrower loan documents, including documents reporting the APRs associated with a loan. All Star caused this software, including Titlehound, to be programmed to make these false allocations of title and settlement service fees and the

resulting false APR calculations, and to produce Maryland Mutual and Hawk Mortgage loan documents to present to borrowers and on which the Maryland Mutual Defendants, the Hawk Mortgage Defendants, and All Star intended borrowers rely.

188.    The Maryland Mutual Defendants, the Hawk Mortgage Defendants, and All Star's choice to falsely allocate fees and manipulate and falsely report APRs fraudulently concealed from Maryland Mutual and Hawk Mortgage borrowers the coordinated business relationships between the Maryland Mutual Defendants, the Hawk Mortgage Defendants, and All Star under the Kickback and Cartel Agreements, the supracompetitive and higher prices for title and settlement services resulting from the Kickback and Cartel Agreements and the pattern of racketeering activity All Star, the Maryland Mutual Defendants, and the Hawk Mortgage Defendants perform in furtherance of the All Star Scheme, and affirmatively prevented Maryland Mutual and Hawk Mortgage borrowers from discovering their injuries resulting therefrom.

**IV.    False Representations in Maryland Mutual and Hawk Mortgage Borrowers' Loan Documents**

189.    In addition to false representations in marketing communications to borrowers and the choice to misrepresent the actual APR's through the intentionally classifying some of All Star's charges as non-APR related charges, the Maryland Mutual Defendants, the Hawk Mortgage Defendants, and All Star choose to make false representations on borrowers' loan documents.

190.    At all relevant times, federal law required Maryland Mutual and Hawk Mortgage, as a lender, to provide a "Good Faith" Estimate to the borrower within three days of taking a loan application. 12 C.F.R. § 1024.7(a)-(b).

191.    Block 4 of the "Good Faith" Estimate is to state only the charges for "title services and lender's title insurance".

192.    As a regular pattern of practice, the Maryland Mutual Defendants and the Hawk Mortgage Defendants falsely include in Block 4 charges that are not title services and lender's title insurance including the Kickback Overcharge, Attorney State Surcharge, and other flat fee overcharges associated with the Kickback and Cartel Agreements and the pattern of racketeering activity All Star, the Maryland Mutual Defendants, and the Hawk Mortgage Defendants perform in furtherance of the All Star Scheme.

193.    The Maryland Mutual Defendants and the Hawk Mortgage Defendants' choice to falsely include these charges in Block 4 of the "Good Faith" Estimate conceals from borrowers: (i) the charges and amounts associated with the surcharges and flat fixed fees, (ii) the fixed and supracompetitive nature of the charges, (iii) the illegal kickbacks, and (iv) the coordinated business relationship between the Maryland Mutual Defendants, the Hawk Mortgage Defendants, and All Star under the Kickback and Cartel Agreements and the pattern of racketeering activity All Star, the Maryland Mutual Defendants, and the Hawk Mortgage Defendants perform in furtherance of the All Star Scheme.

194.    In addition to the GFE, federal law, at all relevant times, required each borrower to receive a HUD-1 Settlement Statement at the closing or settlement of a loan. The settlement agent produces the HUD-1, but federal regulations require the lender to provide to the settlement agent all information appearing in the HUD-1 statement.

195.    Section 1100 of the HUD-1 reports to the borrower the title and settlement services provided on the loan, along with the associated charges to the borrowers for those services.

196. As a continuing pattern and regular business practice, the Maryland Mutual Defendants, the Hawk Mortgage Defendants, and All Star choose and cause the false allocation of fees described in ¶¶ 178-188 to repeat and appear on Maryland Mutual and Hawk Mortgage borrowers' HUD-1 statements in Section 1100.

197. As a continuing pattern and regular business practice, Maryland Mutual and Hawk Mortgage omit and fail to describe anywhere on a borrower's HUD-1 statement the amount of the kickback received by the Maryland Mutual Defendants or the Hawk Mortgage Defendants related to the borrower's loan or the fact that All Star has paid a kickback to Maryland Mutual Defendants or the Hawk Mortgage Defendants for the assignment and referral of the borrower's loan. Maryland Mutual and Hawk Mortgage are required to report the kickback on Line 801 or Line 808 of the HUD-1.

198. As a continuing pattern of practice, Maryland Mutual and Hawk Mortgage omit and fail to describe anywhere on a borrower's HUD-1 statement that the borrower is being charged or the amount of any Kickback Overcharge, Attorney State Surcharge, or other flat fee associated with the fixed prices under the Kickback and Cartel Agreements. Maryland Mutual and Hawk Mortgage are required to report these amounts in Section 1100 or Section 1300 of the HUD-1.

199. These false representations and omissions, presented to Maryland Mutual and Hawk Mortgage borrowers by All Star as Maryland Mutual's and Hawk Mortgage's agent at closing, fraudulently conceal: (i) the charges and amounts associated with the surcharges, overcharges, and flat fixed fees, (ii) the fixed and supracompetitive nature of the charges, (iii) the illegal kickbacks, and (iv) the coordinated business relationship between the Maryland Mutual Defendants, the Hawk Mortgage Defendants, and All Star under the

Kickback and Cartel Agreements and the pattern of racketeering activity All Star, Maryland Mutual Defendants, and the Hawk Mortgage Defendants perform in furtherance of the All Star Scheme.

200. Individually and collectively, the Maryland Mutual Defendants, the Hawk Mortgage Defendants, and All Star's affirmative acts of concealment – the laundering of kickbacks through third party marketing companies, the related creation of shame invoice and payment records, false marketing statements, false allocation of fees and manipulation of the reported APR, and misrepresentations and omissions on borrowers "Good Faith" Estimates, HUD-1s, and other loan documents – are outside the control of Maryland Mutual and Hawk Mortgage borrowers, including Plaintiffs and Class Members, and are in the sole control of, and the result of choices by, the Maryland Mutual Defendants, the Hawk Mortgage Defendants, and All Star.

**V.      Plaintiffs' Reasonable Diligence**

201. As a result of the fraudulent concealments by the Maryland Mutual Defendants, the Hawk Mortgage Defendants, and All Star, Plaintiff Williams, the Robinson Plaintiffs, Plaintiff Cook, and Plaintiff Gordon (and, upon information and belief, all alleged Class Members) had no actual notice before, at or after the closing of their Maryland Mutual or Hawk Mortgage loans of the illegal kickbacks, the exchange of any thing of value between the Maryland Mutual Defendants or the Hawk Mortgage Defendants and All Star, the Price Fixing and Minimum Fee Agreements or the resulting supracompetitive nature of the prices charged for title and settlement services, or the coordinated business relationship of the Maryland Mutual Defendants, the Hawk Mortgage Defendants, and All Star under the Kickback and Cartel Agreements and the pattern of racketeering

activity All Star, the Maryland Mutual Defendants, and the Hawk Mortgage Defendants perform in furtherance of the All Star Scheme.

202.	Plaintiffs exercised reasonable diligence before, during and after the closing of their loans.

**A.	Plaintiff Williams' Reasonable Diligence**

203.	As a result of the fraudulent concealments by the Maryland Mutual Defendants, the Hawk Mortgage Defendants, and All Star, Plaintiff Williams has no actual notice before, at or after the closing of his Maryland Mutual loan of the illegal kickbacks, the exchange of any thing of value between the Maryland Mutual Defendants or the Hawk Mortgage Defendants and All Star, the Price Fixing and Minimum Fee Agreements, the resulting supracompetitive nature of the prices charged for title and settlement services, or the coordinated business relationship of the Maryland Mutual Defendants, the Hawk Mortgage Defendants, and All Star under the Kickback and Cartel Agreements and the pattern of racketeering activity All Star, the Maryland Mutual Defendants, and the Hawk Mortgage Defendants perform in furtherance of the All Star Scheme.

204.	Plaintiff Williams exercises reasonable diligence before, during and after the closing of his loan.

205.	Plaintiff Williams receives loan documents prepared by Maryland Mutual in advance of his closing and reviews those loan documents. Plaintiff Williams's pre-closing loan documents include his "Good Faith" Estimate which he believes, and therefore avers, Maryland Mutual prepared.

206.	The Maryland Mutual Defendants and All Star choose to omit from Plaintiff Williams' "Good Faith" Estimate any description or statement of the coordinated business

49

relationship between the Maryland Mutual Defendants and All Star, or the fact that All Star has paid anything of value for the Maryland Mutual Defnedants' assignment and referral of Plaintiff Williams' loan to All Star. *See* Plaintiff Williams' GFE, attached as **Exhibit 41**.

207.    The Maryland Mutual Defendants and All Star choose to include in Plaintiff Williams' pre-closing documents, including his "Good Faith" Estimate, the fraudulent representations and omission described in ¶¶ 190-193 above.

208.    The Maryland Mutual Defendants and All Star choose to include in Plaintiff Williams' pre-closing documents the false allocation of fees, and, upon information and belief, a false APR as described in ¶¶ 178-188. Plaintiff Williams' belief as to the allocation of fees reflected on the "Good Faith" Estimate is supported by the allocation of fees in his HUD-1, which is consistent with All Star and the Maryland Mutual Defendants' pattern of false allocation of fees and resulting false APR. *See* **Exhibits 33** and **41.**

209.    The Maryland Mutual Defendants and All Star make the false representations and omissions in Plaintiff Williams' pre-closing loan documents for the purposes of concealing, and did so conceal from him, the coordinated business relationship between the Maryland Mutual Defendants and All Star, the Kickback and Cartel Agreements, the fact, nature and amount of the illegal kickbacks related to Plaintiff Williams' loan, and the supracompetitive nature of prices he was charged for title and settlement services.

210.    As is reasonable under the circumstances, Plaintiff Williams believes these pre-closing documents and the representations made therein. A reasonable borrower would have no reason to believe, and Plaintiff Williams does not believe, that: (i) a coordinated business relationship exists between the Maryland Mutual Defendants and All Star; (ii) there has

been any payment or exchange of a thing of value between the Maryland Mutual Defendants and All Star related to the assignment and referral of his Maryland Mutual loan for title and settlement services, or (iii) the prices he will be charged for title and settlement services are fixed and supracompetitive, and the result of Kickback and Cartel Agreements between the Maryland Mutual Defendants and All Star and the pattern of racketeering activity All Star and the Maryland Mutual Defendants perform in furtherance of the All Star Scheme.

211. Plaintiff Williams acts diligently during the closing or settlement of his loan. As a condition of funding his loan, Maryland Mutual requires Plaintiff Williams to participate in a closing, and he attends and fully participates in the required closing, and reviews all documents with All Star's representative.

212. At the closing of his loan, Plaintiff Williams receives from All Star, or its agent, several documents, including a HUD-1 Settlement Statement. *See* Plaintiff Williams' HUD-1, **Exhibit 33**. Plaintiff Williams reviews and signs all of the documents All Star presents at the closing, including the HUD-1 Settlement Statement.

213. The Maryland Mutual Defendants and All Star choose to omit from the documents Plaintiff Williams receives at his closing, including his HUD-1, any description or statement of the coordinated business relationship between the Maryland Mutual Defendants and All Star under any of the Kickback or Cartel Agreements.

214. The Maryland Mutual Defendants and All Star choose to omit from the documents Plaintiff Williams receives at his closing, including his HUD-1, any description or statement of any payment, amount or thing of value that was paid by All Star to the Maryland Mutual Defendants related to Plaintiff Williams' loan.

51

215. The Maryland Mutual Defendants and All Star choose to include in the documents Plaintiff Williams receives at his closing, including his HUD-1, the false allocation of fees as described in ¶¶ 178-188.

216. The Maryland Mutual Defendants and All Star choose to include in the documents Plaintiff Williams receives at his closing, including his HUD-1, the false representations and omissions described in ¶¶ 194-198.

217. The Maryland Mutual Defendants and All Star make the false representations and omissions in Plaintiff Williams' loan closing documents for the purposes of concealing, and did so conceal from him, the coordinated business relationship between the Maryland Mutual Defendants and All Star, the Kickback and Cartel Agreements, the fact, nature, and amount of the illegal kickback related to Plaintiff Williams' loan, the fixed and supracompetitive nature of the prices charged for title and settlement services, and his injuries and actual damages therefrom.

218. As is reasonable under the circumstances, Plaintiff Williams believes these closing documents and the representations made therein. A reasonable borrower would have no reason to believe, and Plaintiff Williams does not believe, that: (i) a coordinated business relationship exists between the Maryland Mutual Defendants and All Star, (ii) there has been any payment or exchange of a thing of value between the Maryland Mutual Defendants and All Star related to the assignment and referral of his Maryland Mutual loan for title and settlement services, or (iii) the prices charged for title and settlement services are fixed and supracompetitive and the result of Kickback and Cartel Agreements between the Maryland Mutual Defendants and All Star and the pattern of

racketeering activity All Star and the Maryland Mutual Defendants perform in furtherance of the All Star Scheme.

219. Plaintiff Williams acts diligently after his closing. On or about December 19, 2018, he receives a letter from undersigned counsel describing an investigation of All Star and Maryland Mutual. This is Plaintiff Williams' first indication of any potential wrongful, illegal, potential harm and/or actionable conduct by anyone related to his Maryland Mutual loan.

220. Within days Plaintiff Williams contacts and retains counsel. Plaintiff Williams files this Complaint within months of becoming aware of facts giving rise to his causes of action, injuries, and actual damages.

221. As a result of the Maryland Mutual Defendants, the Hawk Mortgage Defendants, and All Star's fraudulent concealment, and Plaintiff Williams' reasonable diligence before, during and after the closing of his loan, the statute of limitations on his claims were tolled beginning on the date of his loan closing and continuing until Plaintiff Williams' learning of facts giving rise to his causes of action, on or about December 19, 2018.

**B.     The Robinson Plaintiffs' Reasonable Diligence**

222. As a result of the fraudulent concealments by the Maryland Mutual Defendants, the Hawk Mortgage Defendants, and All Star, the Robinson Plaintiffs have no actual notice before, at or after the closing of their Maryland Mutual loan of the illegal kickbacks, the exchange of any thing of value between the Maryland Mutual Defendants or the Hawk Mortgage Defendants and All Star, the Price Fixing and Minimum Fee Agreements, the resulting supracompetitive nature of the prices charged for title and settlement services, or the coordinated business relationship of the Maryland Mutual Defendants, the Hawk

Mortgage Defendants, and All Star under the Kickback and Cartel Agreements and the pattern of racketeering activity All Star, the Maryland Mutual Defendants, and the Hawk Mortgage Defendants, perform in furtherance of the All Star Scheme.

223. The Robinson Plaintiffs exercise reasonable diligence before, during and after the closing of their loan.

224. The Robinson Plaintiffs receive loan documents prepared by the Maryland Mutual Defendants in advance of their closing and review those loan documents. The Robinson Plaintiffs' pre-closing loan documents include their "Good Faith" Estimate which they believe, and therefore aver, the Maryland Mutual Defendants prepared.

225. The Maryland Mutual Defendants and All Star choose to omit from the Robinson Plaintiffs' "Good Faith" Estimate any description or statement of the coordinated business relationship between the Maryland Mutual Defendants and All Star, or the fact that All Star has paid anything of value for the Maryland Mutual Defendants' assignment and referral of the Robinson Plaintiffs' loan to All Star.

226. The Maryland Mutual Defendants and All Star choose to include in the Robinson Plaintiffs' pre-closing documents, including their "Good Faith" Estimate, the fraudulent representations and omission described in ¶¶ 190-193 above.

227. The Maryland Mutual Defendants and All Star choose to include in the Robinson Plaintiffs' pre-closing documents the false allocation of fees, and, upon information and belief, a false APR as described in ¶¶ 178-188.

228. The Maryland Mutual Defendants and All Star make the false representations and omissions in the Robinson Plaintiffs' pre-closing loan documents for the purposes of concealing, and did so conceal from them, the coordinated business relationship between

the Maryland Mutual Defendants and All Star, the Kickback and Cartel Agreements, the fact, nature and amount of the illegal kickbacks related to the Robinson Plaintiffs' loan, and the supracompetitive nature of prices they were charged for title and settlement services.

229. As is reasonable under the circumstances, the Robinson Plaintiffs believe these pre-closing documents and the representations made therein. A reasonable borrower would have no reason to believe, and the Robinson Plaintiffs do not believe, that: (i) a coordinated business relationship exists between the Maryland Mutual Defendants and All Star; (ii) there has been any payment or exchange of a thing of value between the Maryland Mutual Defendants and All Star related to the assignment and referral of their Maryland Mutual loan for title and settlement services, or (iii) the prices they will be charged for title and settlement services are fixed and supracompetitive, and the result of Kickback and Cartel Agreements between the Maryland Mutual Defendants and All Star and the pattern of racketeering activity All Star and the Maryland Mutual Defendants perform in furtherance of the All Star Scheme.

230. The Robinson Plaintiffs act diligently during the closing or settlement of their loan. As a condition of funding their loan, Maryland Mutual requires the Robinson Plaintiffs to participate in a closing, and they attend and fully participate in the required closing, and review all documents with All Star's representative.

231. At the closing of their loan, the Robinson Plaintiffs receive from All Star, or its agent, several documents, including a HUD-1 Settlement Statement. The Robinson Plaintiffs review and sign all of the documents All Star presents at the closing, including the HUD-1 Settlement Statement.

232.    The Maryland Mutual Defendants and All Star choose to omit from the documents the Robinson Plaintiffs receives at their closing, including their HUD-1, any description or statement of the coordinated business relationship between the Maryland Mutual Defendants and All Star under any of the Kickback or Cartel Agreements.

233.    The Maryland Mutual Defendants and All Star choose to omit from the documents the Robinson Plaintiffs receive at their closing, including their HUD-1, any description or statement of any payment, amount or thing of value that was paid by All Star to the Maryland Mutual Defendants related to the Robinson Plaintiffs' loan.

234.    The Maryland Mutual Defendants and All Star choose to include in the documents the Robinson Plaintiffs receives at their closing, including their HUD-1, the false allocation of fees as described in ¶¶ 178-188.

235.    The Maryland Mutual Defendants and All Star choose to include in the documents the Robinson Plaintiffs receive at their closing, including their HUD-1, the false representations and omissions described in ¶¶ 194-198.

236.    The Maryland Mutual Defendants and All Star make the false representations and omissions in the Robinson Plaintiffs' loan closing documents for the purposes of concealing, and did so conceal from them, the coordinated business relationship between the Maryland Mutual Defendants and All Star, the Kickback and Cartel Agreements, the fact, nature, and amount of the illegal kickback related to the Robinson Plaintiffs' loan, the fixed and supracompetitive nature of the prices charged for title and settlement services, and their injuries and actual damages therefrom.

237.    As is reasonable under the circumstances, the Robinson Plaintiffs believe these closing documents and the representations made therein. A reasonable borrower would have no

reason to believe, and the Robinson Plaintiffs do not believe, that: (i) a coordinated business relationship exists between the Maryland Mutual Defendants and All Star, (ii) there has been any payment or exchange of a thing of value between the Maryland Mutual Defendants and All Star related to the assignment and referral of their Maryland Mutual loan for title and settlement services, or (iii) the prices charged for title and settlement services are fixed and supracompetitive and the result of Kickback and Cartel Agreements between the Maryland Mutual Defendants and All Star and the pattern of racketeering activity All Star and the Maryland Mutual Defendants perform in furtherance of the All Star Scheme.

238.　The Robinson Plaintiffs act diligently after their closing.  On or about December 19, 2018, the Robinson Plaintiffs receive a letter from undersigned counsel describing an investigation of All Star and Maryland Mutual.  This is the Robinson Plaintiffs' first indication of any potential wrongful, illegal, potential harm and/or actionable conduct by anyone related to their Maryland Mutual loan.

239.　Within days the Robinson Plaintiffs contact and retain counsel.  The Robinson Plaintiffs file this Complaint within months of becoming aware of facts giving rise to their causes of action, injuries, and actual damages.

240.　As a result of the Maryland Mutual Defendants, the Hawk Mortgage Defendants, and All Star's fraudulent concealment, and the Robinson Plaintiffs' reasonable diligence before, during and after the closing of their loan, the statute of limitations on their claims were tolled beginning on the date of their loan closing and continuing until the Robinson Plaintiffs' learning of facts giving rise to their causes of action, on or about December 19, 2018.

## C.     Plaintiff Cook's Reasonable Diligence

241.    As a result of the fraudulent concealments by the Maryland Mutual Defendants, the Hawk Mortgage Defendants, and All Star, Plaintiff Cook has no actual notice before, at or after the closing of his Maryland Mutual loan of the illegal kickbacks, the exchange of any thing of value between the Maryland Mutual Defendants or the Hawk Mortgage Defendants and All Star, the Price Fixing and Minimum Fee Agreements, the resulting supracompetitive nature of the prices charged for title and settlement services, or the coordinated business relationship of the Maryland Mutual Defendants, the Hawk Mortgage Defendants, and All Star under the Kickback and Cartel Agreements and the pattern of racketeering activity All Star, the Maryland Mutual Defendants and the Hawk Mortgage Defendants perform in furtherance of the All Star Scheme.

242.    Plaintiff Cook exercises reasonable diligence before, during and after the closing of his loan.

243.    Plaintiff Cook receives loan documents prepared by the Maryland Mutual Defendants in advance of his closing and reviews those loan documents.  Plaintiff Cook's pre-closing loan documents include his "Good Faith" Estimate which he believes, and therefore avers, the Maryland Mutual Defendants prepared.  *See* Plaintiff Cook's GFE, attached as **Exhibit 42**.

244.    The Maryland Mutual Defendants and All Star choose to omit from Plaintiff Cook's "Good Faith" Estimate any description or statement of the coordinated business relationship between the Maryland Mutual Defendants and All Star, or the fact that All Star has paid anything of value for the Maryland Mutual Defendants' assignment and referral of Plaintiff Cook's loan to All Star.

245. The Maryland Mutual Defendants and All Star choose to include in Plaintiff Cook's pre-closing documents, including his "Good Faith" Estimate, the fraudulent representations and omission described in ¶¶ 190-193 above.

246. The Maryland Mutual Defendants and All Star choose to include in Plaintiff Cook's pre-closing documents the false allocation of fees, and, upon information and belief, a false APR as described in ¶¶ 178-188.

247. The Maryland Mutual Defendants and All Star make the false representations and omissions in Plaintiff Cook's pre-closing loan documents for the purposes of concealing, and did so conceal from him, the coordinated business relationship between the Maryland Mutual Defendants and All Star, the Kickback and Cartel Agreements, the fact, nature and amount of the illegal kickbacks related to Plaintiff Cook's loan, and the supracompetitive nature of prices he was charged for title and settlement services.

248. As is reasonable under the circumstances, Plaintiff Cook believes these pre-closing documents and the representations made therein. A reasonable borrower would have no reason to believe, and Plaintiff Cook does not believe, that: (i) a coordinated business relationship exists between the Maryland Mutual Defendants and All Star; (ii) there has been any payment or exchange of a thing of value between the Maryland Mutual Defendants and All Star related to the assignment and referral of his Maryland Mutual loan for title and settlement services, or (iii) the prices he will be charged for title and settlement services are fixed and supracompetitive, and the result of Kickback and Cartel Agreements between the Maryland Mutual Defendants and All Star and the pattern of racketeering activity All Star and the Maryland Mutual Defendants perform in furtherance of the All Star Scheme.

249. Plaintiff Cook acts diligently during the closing or settlement of his loan. As a condition of funding his loan, Maryland Mutual requires Plaintiff Cook to participate in a closing, and he attends and fully participates in the required closing, and reviews all documents with All Star's representative.

250. At the closing of his loan, Plaintiff Cook receives from All Star, or its agent, several documents, including a HUD-1 Settlement Statement. Plaintiff Cook reviews and signs all of the documents All Star presents at the closing, including the HUD-1 Settlement Statement.

251. The Maryland Mutual Defendants and All Star choose to omit from the documents Plaintiff Cook receives at his closing, including his HUD-1, any description or statement of the coordinated business relationship between the Maryland Mutual Defendants and All Star under any of the Kickback or Cartel Agreements.

252. The Maryland Mutual Defendants and All Star choose to omit from the documents Plaintiff Cook receives at his closing, including his HUD-1, any description or statement of any payment, amount or thing of value that was paid by All Star to the Maryland Mutual Defendants related to Plaintiff Cook's loan.

253. The Maryland Mutual Defendants and All Star choose to include in the documents Plaintiff Cook receives at his closing, including his HUD-1, the false allocation of fees as described in ¶¶ 178-188.

254. The Maryland Mutual Defendants and All Star choose to include in the documents Plaintiff Cook receives at his closing, including his HUD-1, the false representations and omissions described in ¶¶ 194-198.

255.    The Maryland Mutual Defendants and All Star make the false representations and omissions in Plaintiff Cook's loan closing documents for the purposes of concealing, and did so conceal from him, the coordinated business relationship between the Maryland Mutual Defendants and All Star, the Kickback and Cartel Agreements, the fact, nature, and amount of the illegal kickback related to Plaintiff Cook's loan, the fixed and supracompetitive nature of the prices charged for title and settlement services, and his injuries and actual damages therefrom.

256.    As is reasonable under the circumstances, Plaintiff Cook believes these closing documents and the representations made therein. A reasonable borrower would have no reason to believe, and Plaintiff Cook does not believe, that: (i) a coordinated business relationship exists between the Maryland Mutual Defendants and All Star, (ii) there has been any payment or exchange of a thing of value between the Maryland Mutual Defendants and All Star related to the assignment and referral of his Maryland Mutual loan for title and settlement services, or (iii) the prices charged for title and settlement services are fixed and supracompetitive and the result of Kickback and Cartel Agreements between the Maryland Mutual Defendants and All Star and the pattern of racketeering activity All Star and the Maryland Mutual Defendants perform in furtherance of the All Star Scheme.

257.    Plaintiff Cook acts diligently after his closing.  On or about January 14, 2019, Plaintiff Cook receives a letter from undersigned counsel describing an investigation of All Star and Maryland Mutual.  This is Plaintiff Cook's first indication of any potential wrongful, illegal, potential harm and/or actionable conduct by anyone related to his Maryland Mutual loan.

258.   Within days Plaintiff Cook contacts and retains counsel.   Plaintiff Cook files this Complaint within months of becoming aware of facts giving rise to his causes of action, injuries, and actual damages.

259.   As a result of the Maryland Mutual Defendants, the Hawk Mortgage Defendants, and All Star's fraudulent concealment, and Plaintiff Cook's reasonable diligence before, during and after the closing of his loan, the statute of limitations on his claims were tolled beginning on the date of his loan closing and continuing until Plaintiff Cook's learning of facts giving rise to his causes of action, on or about January 14, 2019.

**D.    Plaintiff Gordon's Reasonable Diligence**

260.   As a result of the fraudulent concealments by the Maryland Mutual Defendants, the Hawk Mortgage Defendants, and All Star, Plaintiff Gordon has no actual notice before, at or after the closing of his Maryland Mutual loan of the illegal kickbacks, the exchange of any thing of value between the Maryland Mutual Defendants or the Hawk Mortgage Defendants and All Star, the Price Fixing and Minimum Fee Agreements, the resulting supracompetitive nature of the prices charged for title and settlement services, or the coordinated business relationship of the Maryland Mutual Defendants, the Hawk Mortgage Defendants and All Star under the Kickback and Cartel Agreements and the pattern of racketeering activity All Star, the Maryland Mutual Defendants, and the Hawk Mortgage Defendants perform in furtherance of the All Star Scheme.

261.   Plaintiff Gordon exercises reasonable diligence before, during and after the closing of his loan.

262.   Plaintiff Gordon receives loan documents prepared by the Maryland Mutual Defendants in advance of his closing and reviews those loan documents.   Plaintiff Gordon's pre-

closing loan documents include his "Good Faith" Estimate which he believes, and therefore avers, the Maryland Mutual Defendants prepared.

263.    The Maryland Mutual Defendants and All Star choose to omit from Plaintiff Gordon's "Good Faith" Estimate any description or statement of the coordinated business relationship between the Maryland Mutual Defendants and All Star, or the fact that All Star has paid anything of value for the Maryland Mutual Defendants' assignment and referral of Plaintiff Gordon's loan to All Star.

264.    The Maryland Mutual Defendants and All Star choose to include in Plaintiff Gordon's pre-closing documents, including his "Good Faith" Estimate, the fraudulent representations and omission described in ¶¶ 190-193 above.

265.    The Maryland Mutual Defendants and All Star choose to include in Plaintiff Gordon's pre-closing documents the false allocation of fees, and, upon information and belief, a false APR as described in ¶¶ 178-188. Plaintiff Gordon's belief as to the allocation of fees reflected on the "Good Faith" Estimate is supported by the allocation of fees in his HUD-1, which is consistent with All Star and the Maryland Mutual Defendants' pattern of false allocation of fees and resulting false APR. *See* **Exhibit 34.**

266.    The Maryland Mutual Defendants and All Star make the false representations and omissions in Plaintiff Gordon's pre-closing loan documents for the purposes of concealing, and did so conceal from him, the coordinated business relationship between the Maryland Mutual Defendants and All Star, the Kickback and Cartel Agreements, the fact, nature and amount of the illegal kickbacks related to Plaintiff Gordon's loan, and the supracompetitive nature of prices he was charged for title and settlement services.

267. As is reasonable under the circumstances, Plaintiff Gordon believes these pre-closing documents and the representations made therein. A reasonable borrower would have no reason to believe, and Plaintiff Gordon does not believe, that: (i) a coordinated business relationship exists between the Maryland Mutual Defendants and All Star; (ii) there has been any payment or exchange of a thing of value between the Maryland Mutual Defendants and All Star related to the assignment and referral of his Maryland Mutual loan for title and settlement services, or (iii) the prices he will be charged for title and settlement services are fixed and supracompetitive, and the result of Kickback and Cartel Agreements between the Maryland Mutual Defendants and All Star and the pattern of racketeering activity All Star and the Maryland Mutual Defendants perform in furtherance of the All Star Scheme.

268. Plaintiff Gordon acts diligently during the closing or settlement of his loan. As a condition of funding his loan, Maryland Mutual requires Plaintiff Gordon to participate in a closing, and he attends and fully participates in the required closing, and reviews all documents with All Star's representative.

269. At the closing of his loan, Plaintiff Gordon receives from All Star, or its agent, several documents, including a HUD-1 Settlement Statement. *See* Plaintiff Gordon's HUD-1, **Exhibit 34**. Plaintiff Gordon reviews and signs all of the documents All Star presents at the closing, including the HUD-1 Settlement Statement.

270. The Maryland Mutual Defendants and All Star choose to omit from the documents Plaintiff Gordon receives at his closing, including his HUD-1, any description or statement of the coordinated business relationship between the Maryland Mutual Defendants and All Star under any of the Kickback or Cartel Agreements.

271. The Maryland Mutual Defendants and All Star choose to omit from the documents Plaintiff Gordon receives at his closing, including his HUD-1, any description or statement of any payment, amount or thing of value that was paid by All Star to the Maryland Mutual Defendants related to Plaintiff Gordon's loan.

272. The Maryland Mutual Defendants and All Star choose to include in the documents Plaintiff Gordon receives at his closing, including his HUD-1, the false allocation of fees as described in ¶¶ 178-188.

273. The Maryland Mutual Defendants and All Star choose to include in the documents Plaintiff Gordon receives at his closing, including his HUD-1, the false representations and omissions described in ¶¶ 194-198.

274. The Maryland Mutual Defendants and All Star make the false representations and omissions in Plaintiff Gordon's loan closing documents for the purposes of concealing, and did so conceal from him, the coordinated business relationship between the Maryland Mutual Defendants and All Star, the Kickback and Cartel Agreements, the fact, nature, and amount of the illegal kickback related to Plaintiff Gordon's loan, the fixed and supracompetitive nature of the prices charged for title and settlement services, and his injuries and actual damages therefrom.

275. As is reasonable under the circumstances, Plaintiff Gordon believes these closing documents and the representations made therein. A reasonable borrower would have no reason to believe, and Plaintiff Gordon does not believe, that: (i) a coordinated business relationship exists between the Maryland Mutual Defendants and All Star, (ii) there has been any payment or exchange of a thing of value between the Maryland Mutual Defendants and All Star related to the assignment and referral of his Maryland Mutual

loan for title and settlement services, or (iii) the prices charged for title and settlement services are fixed and supracompetitive and the result of Kickback and Cartel Agreements between the Maryland Mutual Defendants and All Star and the pattern of racketeering activity All Star and the Maryland Mutual Defendants perform in furtherance of the All Star Scheme.

276. Plaintiff Gordon acts diligently after his closing. On or about January 14, 2019, Plaintiff Gordon receives a letter from undersigned counsel describing an investigation of All Star and Maryland Mutual. This is Plaintiff Gordon's first indication of any potential wrongful, illegal, potential harm and/or actionable conduct by anyone related to his Maryland Mutual loan.

277. Within days Plaintiff Gordon contacts and retains counsel. Plaintiff Gordon files this Complaint within months of becoming aware of facts giving rise to his causes of action, injuries, and actual damages.

278. As a result of the Maryland Mutual Defendants, the Hawk Mortgage Defendants, and All Star's fraudulent concealment, and Plaintiff Gordon's reasonable diligence before, during and after the closing of his loan, the statute of limitations on his claims were tolled beginning on the date of his loan closing and continuing until Plaintiff Gordon's learning of facts giving rise to his causes of action, on or about January 14, 2019.

E.     The Enochs Plaintiffs' Reasonable Diligence

279. As a result of the fraudulent concealments by the Maryland Mutual Defendants, the Hawk Mortgage Defendants, and All Star, the Enochs Plaintiffs have no actual notice before, at or after the closing of their Hawk Mortgage loan of the illegal kickbacks, the exchange of any thing of value between the Maryland Mutual Defendants or the Hawk

Mortgage Defendants and All Star, the Price Fixing and Minimum Fee Agreements, the resulting supracompetitive nature of the prices charged for title and settlement services, or the coordinated business relationship of the Maryland Mutual Defendants, the Hawk Mortgage Defendants, and All Star under the Kickback and Cartel Agreements and the pattern of racketeering activity All Star, the Maryland Mutual Defendants, and the Hawk Mortgage Defendants, perform in furtherance of the All Star Scheme.

280. The Enochs Plaintiffs exercise reasonable diligence before, during and after the closing of their loan.

281. The Enochs Plaintiffs receive loan documents prepared by the Hawk Mortgage Defendants in advance of their closing and review those loan documents. The Enochs Plaintiffs' pre-closing loan documents include their "Good Faith" Estimate which they believe, and therefore aver, the Hawk Mortgage Defendants prepared.

282. The Hawk Mortgage Defendants and All Star choose to omit from the Enochs Plaintiffs' "Good Faith" Estimate any description or statement of the coordinated business relationship between the Hawk Mortgage Defendants and All Star, or the fact that All Star has paid anything of value for the Hawk Mortgage Defendants' assignment and referral of the Enochs Plaintiffs' loan to All Star.

283. The Hawk Mortgage Defendants and All Star choose to include in the Enochs Plaintiffs' pre-closing documents, including their "Good Faith" Estimate, the fraudulent representations and omission described in ¶¶ 190-193 above.

284. The Hawk Mortgage Defendants and All Star choose to include in the Enochs Plaintiffs' pre-closing documents the false allocation of fees, and, upon information and belief, a false APR as described in ¶¶ 178-188.

285. The Hawk Mortgage Defendants and All Star make the false representations and omissions in the Enochs Plaintiffs' pre-closing loan documents for the purposes of concealing, and did so conceal from them, the coordinated business relationship between the Hawk Mortgage Defendants and All Star, the Kickback and Cartel Agreements, the fact, nature and amount of the illegal kickbacks related to the Enochs Plaintiffs' loan, and the supracompetitive nature of prices they were charged for title and settlement services.

286. As is reasonable under the circumstances, the Enochs Plaintiffs believe these pre-closing documents and the representations made therein. A reasonable borrower would have no reason to believe, and the Enochs Plaintiffs do not believe, that: (i) a coordinated business relationship exists between the Hawk Mortgage Defendants and All Star; (ii) there has been any payment or exchange of a thing of value between the Hawk Mortgage Defendants and All Star related to the assignment and referral of their Hawk Mortgage loan for title and settlement services, or (iii) the prices they will be charged for title and settlement services are fixed and supracompetitive, and the result of Kickback and Cartel Agreements between the Hawk Mortgage Defendants and All Star and the pattern of racketeering activity All Star and the Hawk Mortgage Defendants perform in furtherance of the All Star Scheme.

287. The Enochs Plaintiffs act diligently during the closing or settlement of their loan. As a condition of funding their loan, Hawk Mortgage requires the Enochs Plaintiffs to participate in a closing, and they attend and fully participate in the required closing, and review all documents with All Star's representative.

288. At the closing of their loan, the Enochs Plaintiffs receive from All Star, or its agent, several documents, including a HUD-1 Settlement Statement. The Enochs Plaintiffs

review and sign all of the documents All Star presents at the closing, including the HUD-1 Settlement Statement.

289. The Hawk Mortgage Defendants and All Star choose to omit from the documents the Enochs Plaintiffs receives at their closing, including their HUD-1, any description or statement of the coordinated business relationship between the Hawk Mortgage Defendants and All Star under any of the Kickback or Cartel Agreements.

290. The Hawk Mortgage Defendants and All Star choose to omit from the documents the Enochs Plaintiffs receive at their closing, including their HUD-1, any description or statement of any payment, amount or thing of value that was paid by All Star to the Hawk Mortgage Defendants related to the Enochs Plaintiffs' loan.

291. The Hawk Mortgage Defendants and All Star choose to include in the documents the Enochs Plaintiffs receives at their closing, including their HUD-1, the false allocation of fees as described in ¶¶ 178-188.

292. The Hawk Mortgage Defendants and All Star choose to include in the documents the Enochs Plaintiffs receive at their closing, including their HUD-1, the false representations and omissions described in ¶¶ 194-198.

293. The Hawk Mortgage Defendants and All Star make the false representations and omissions in the Enochs Plaintiffs' loan closing documents for the purposes of concealing, and did so conceal from them, the coordinated business relationship between the Hawk Mortgage Defendants and All Star, the Kickback and Cartel Agreements, the fact, nature, and amount of the illegal kickback related to the Enochs Plaintiffs' loan, the fixed and supracompetitive nature of the prices charged for title and settlement services, and their injuries and actual damages therefrom.

294. As is reasonable under the circumstances, the Enochs Plaintiffs believe these closing documents and the representations made therein. A reasonable borrower would have no reason to believe, and the Robinson Plaintiffs do not believe, that: (i) a coordinated business relationship exists between the Hawk Mortgage Defendants and All Star, (ii) there has been any payment or exchange of a thing of value between the Hawk Mortgage Defendants and All Star related to the assignment and referral of their Hawk Mortgage loan for title and settlement services, or (iii) the prices charged for title and settlement services are fixed and supracompetitive and the result of Kickback and Cartel Agreements between the Hawk Mortgage Defendants and All Star and the pattern of racketeering activity All Star and the Hawk Mortgage Defendants perform in furtherance of the All Star Scheme.

295. The Enochs Plaintiffs act diligently after their closing. On or about May 15, 2019, the Enochs Plaintiffs receive a letter from undersigned counsel describing an investigation of All Star and Hawk Mortgage. This is the Enochs Plaintiffs' first indication of any potential wrongful, illegal, potential harm and/or actionable conduct by anyone related to their Hawk Mortgage loan.

296. Within days the Enochs Plaintiffs contact and retain counsel. The Enochs Plaintiffs file this Complaint within months of becoming aware of facts giving rise to their causes of action, injuries, and actual damages.

297. As a result of the Maryland Mutual Defendants, the Hawk Mortgage Defendants, and All Star's fraudulent concealment, and the Enochs Plaintiffs' reasonable diligence before, during and after the closing of their loan, the statute of limitations on their claims were tolled beginning on the date of their loan closing and continuing until the Enochs

Plaintiffs' learning of facts giving rise to their causes of action, on or about May 15, 2019.

## VI.  Accrual and Tolling of Limitations

298. Plaintiff Cook's claims pursuant to pursuant to 15 U.S.C. § 1 and 18 U.S.C. § 1964 accrued at the earliest, for the purpose of the limitations period provided in 15 U.SC. § 15(b), on the date of his injury, that is on or about May 22, 2015, the date his loan proceeds were disbursed and Plaintiff Cook incurred and paid the fixed and supracompetitive prices resulting from the Kickback and Cartel Agreements and the pattern of racketeering activity All Star, the Maryland Mutual Defendants, and the Hawk Mortgage Defendants perform in furtherance of the All Star Scheme.  Plaintiff Cook's claims are brought within four years of that date, and are not subject to any limitations defense.

299. In addition, Plaintiff Gordon's claims pursuant to pursuant to 15 U.S.C. § 1 and 18 U.S.C. § 1964 accrued at the earliest, for the purpose of the limitations period provided in 15 U.SC. § 15(b), on the date of his injury, that is on or about May 28, 2015, the date his loan proceeds were disbursed and Plaintiff Gordon incurred and paid the fixed and supracompetitive prices resulting from the Kickback and Cartel Agreements and the pattern of racketeering activity All Star, the Maryland Mutual Defendants, and the Hawk Mortgage Defendants perform in furtherance of the All Star Scheme.  Plaintiff Gordon's claims are brought within four years of that date, and are not subject to any limitations defense.

300. In addition, the Enochs Plaintiffs' claims pursuant to pursuant to 15 U.S.C. § 1 and 18 U.S.C. § 1964 accrued at the earliest, for the purpose of the limitations period provided in

15 U.S.C. § 15(b), on the date of their injury, that is on or about September 23, 2015, the date their loan proceeds were disbursed and Enochs Plaintiffs incurred and paid the fixed and supracompetitive prices resulting from the Kickback and Cartel Agreements and the pattern of racketeering activity All Star, the Maryland Mutual Defendants, and the Hawk Mortgage Defendants perform in furtherance of the All Star Scheme. The Enochs Plaintiffs' claims are brought within four years of that date, and are not subject to any limitations defense.

301. In addition, and in the alternative, the limitations period provided in 15 U.S.C. § 15(b), applicable to claims pursuant to 15 U.S.C. § 1 and 18 U.S.C. § 1964, is subject to the discovery of injury rule. *Detrick v. Panalpina,* 108 F.3d 529 (4th Cir. 1997) *cert. denied* 1997 U.S. Dist. LEXIS 4626. The Maryland Mutual Defendants' and the Hawk Mortgage Defendants' affirmative and fraudulent acts precluded Maryland Mutual and Hawk Mortgage borrowers, including all Plaintiffs and Class Members, from discovering the fixed and supracompetitive nature of the prices charged for title and settlement services, and affirmatively prevented Maryland Mutual and Hawk Mortgage borrowers, including Plaintiffs and Class Members, from discovering the fact of their injuries resulting therefrom.

302. As a result, Plaintiffs', and Class Members', claims pursuant to 15 U.S.C. § 1 and 18 U.S.C. § 1964 did not accrue, for the purpose of the limitations period provided in 15 U.S.C. § 15(b), until such time as Plaintiffs, and Class Members, knew, or should have known, of their injury – for Plaintiff Williams and the Robinson Plaintiffs, on or about December 19, 2018, for Plaintiff Cook and Plaintiff Gordon, on or about January 14, 2019, and for the Enochs Plaintiffs, on or about May 15, 2019.

303. In addition and in the alternative, as a result of Maryland Mutual, Hawk Mortgage, and All Star's fraudulent concealments and Plaintiffs' reasonable diligence before, during and after the closing of Plaintiffs' loans, the statute of limitations as to all causes of action pled herein are and should be tolled beginning on the date of each Plaintiffs' loan closing and continuing until the learning of facts giving rise to the causes of action pled herein – for Plaintiff Williams and the Robinson Plaintiffs, on or about December 19, 2018, and for Plaintiff Cook and Plaintiff Gordon, on or about January 14, 2019, and for the Enochs Plaintiffs, on or about May 15, 2019.

304. Plaintiffs believe, and therefore aver, that the fraudulent concealments described herein were an integral component of the Kickback and Cartel Agreements and the All Star Scheme, and typical of all alleged Class Members' transactions such that all Class Members are entitled to the tolling of applicable limitations period.

## COUNT I
### Violation of the Real Estate Settlement Procedures Act (RESPA), 12 U.S.C. § 2607(a)

305. Plaintiffs incorporate the above stated paragraphs as if restated herein.

306. All transactions at issue in the instant complaint are incident to or part of real estate settlement services involving federally related mortgage loans and thereby are subject to the provisions of RESPA, 12 U.S.C. § 2601, *et seq.*

307. The Maryland Mutual Defendants and the Hawk Mortgage Defendants by and through their officers, mortgage brokers, loan officers, employees and/or agents received and accepted things of value paid by All Star in exchange for the assignment and referral of business to All Star in violation of RESPA, 12 U.S.C. § 2607(a).

308. All loans referred to All Star under the Kickback Scheme were secured by first or subordinate liens on residential real property and were made in whole or in part by Maryland Mutual or Hawk Mortgage and/or their affiliates whose deposits or accounts are insured by the Federal Government and/or who are regulated by an agency of the Federal Government.

309. The payment and/or arranging of payment of kickbacks to the Maryland Mutual Defendants and the Hawk Mortgage Defendants by All Star and the Maryland Mutual Defendants' and the Hawk Mortgage Defendants' receipt thereof constitute a violation of § 8(a) of RESPA, which prohibits the payment of referral fees or kickbacks pursuant to an agreement in connection with the origination or brokering of federally related mortgage loans.

310. Plaintiffs allege claims for violations of 12 U.S.C. §2607(a) on their own behalf and pursuant to Fed. R. Civ. P. 23 with the class defined as follows:

> All individuals in the United States who were borrowers on a federally related mortgage loan (as defined under the Real Estate Settlement Procedures Act, 12 U.S.C. § 2602) originated or brokered by Maryland Mutual Mortgage, LLC or Hawk Mortgage Company, LLC for which All Star Title, Inc. provided a settlement service, as identified in Section 1100 on the borrower's HUD-1, between January 1, 2010 and December 31, 2017. Exempted from this class is any person who, during the period of January 1, 2010 through December 31, 2017, was an employee, officer, member and/or agent of Maryland Mutual Mortgage, LLC, Hawk Mortgage Company, LLC, or All Star Title, Inc.

> (the "RESPA Class").

311. There are questions of law and fact common to the claims of each and all members of the RESPA Class. These common questions include, but are not limited to:

a. Whether there existed a referral agreement between Maryland Mutual Defendants, the Hawk Mortgage Defendants, and All Star whereby the Maryland Mutual Defendants and the Hawk Mortgage Defendants agreed to assign and refer Maryland Mutual and Hawk Mortgage loans, refinances and reverse mortgages to All Star in exchange for receiving kickbacks;

b. Whether the Maryland Mutual Defendants and the Hawk Mortgage Defendants and their employees and/or agents received illegal kickbacks from All Star for the assignment and referral of business to All Star;

c. Whether the illegal kickbacks to the Maryland Mutual Defendants and the Hawk Mortgage Defendants and their employees and/or agents violated RESPA;

d. Whether the Maryland Mutual Defendants, the Hawk Mortgage Defendants, and All Star used third party marketing companies to launder kickbacks related to Maryland Mutual and Hawk Mortgage loans;

e. Whether Plaintiffs and RESPA Class Members were forced to pay more for said settlement services;

f. Whether the Maryland Mutual Defendants and the Hawk Mortgage Defendants used sham and/or split invoices and sham payment records to actively and fraudulently conceal the payment, receipt and acceptance of illegal kickbacks;

g. Whether the Maryland Mutual Defendants and the Hawk Mortgage Defendants disclosed or described to any borrower its coordinated business relationship with All Star or the fact that a thing of value had been exchanged between the Maryland Mutual Defendants, the Hawk Mortgage Defendants, and All Star related to any borrower's loan;

h.  Whether the Maryland Mutual Defendants and the Hawk Mortgage Defendants disclosed or described on any borrowers "Good Faith" Estimate, HUD-1 or other loan document the Maryland Mutual Defendants' or the Hawk Mortgage Defendants' coordinated business relationship with All Star or the fact that a thing of value had been exchanged between the Maryland Mutual Defendants, the Hawk Mortgage Defendants, and All Star related to any borrower's loan;

i.  Whether despite exercising reasonable due diligence, Plaintiffs and RESPA Class Members did not and could not have learned of the illegal kickbacks until contacted by counsel;

j.  Whether Plaintiffs and RESPA Class Members are entitled to treble damages under RESPA; and

k.  Whether Plaintiffs and RESPA Class Members are entitled to attorneys' fees and expenses under RESPA.

312.  These common issues of law and fact predominate over any question affecting only individual RESPA Class Members.

313.  Plaintiffs' transactions and claims are typical of the claims or defenses of the respective RESPA Class Members, and are subject to the same statutory measure of damages set forth in 12 U.S.C. § 2607(d)(2).

314.  Plaintiffs will fairly and adequately protect the interests of the RESPA Class. The interests Plaintiffs and all other members of the RESPA Class are identical.

315.  Plaintiffs' counsel has substantial experience in complex litigation and class action proceedings, have been approved as class and settlement class counsel in multiple U.S.

District Courts in similar litigation, and will adequately represent the RESPA Class's interests.

316. The RESPA Class consists of borrowers on more than 400 loans, and thus are so numerous that joinder of all members is impracticable.

317. Separate actions by individual members of the class would create a risk of inconsistent or varying adjudications with respect to individual members of the class that would establish incompatible standards of conduct for the Maryland Mutual Defendants and the Hawk Mortgage Defendants.

318. This action entails questions of law and fact common to RESPA Class Members that predominate over any questions affecting only individual plaintiffs; therefore, a class action is superior to other available methods of fair and efficient adjudication of this litigation.

319. Most members of the RESPA Class are unaware of their rights to prosecute a claim against the Maryland Mutual Defendants or the Hawk Mortgage Defendants.

320. No member of the RESPA Class has a substantial interest in individually controlling the prosecution of a separate action, but if he or she does, he or she may exclude himself or herself from the class upon the receipt of notice under Fed. R. Civ. P. 23(c).

**COUNT II**
**Violation of the Sherman Act,**
**15 U.S.C. § 1**

321. Plaintiffs incorporate the above stated paragraphs as if restated herein.

322. All Star, the Maryland Mutual Defendants, and the Hawk Mortgage Defendants conspired to and executed an agreement to fix the price of title and settlement services

charged to borrowers on refinances, reverse mortgages, and other mortgage loans, in violation of the Sherman Act, 15 U.S.C. § 1.

323.    As a direct and proximate result of the Cartel Agreements between the Maryland Mutual Defendants, the Hawk Mortgage Defendants, and All Star, Plaintiffs and Class Members were charged and paid supracompetitive prices for title and settlement services and were charged and paid more for title and settlement services than they otherwise would have without the Cartel Agreements.

324.    As a direct and proximate result of the Cartel Agreements between Maryland Mutual Defendants, the Hawk Mortgage Defendants, and All Star, Plaintiffs and Class Members were injured and suffered actual damages in the amount of between $50-950, which is the minimum difference between the lowest amount charged by All Star for settlement services with another lender and the amount charged to Plaintiffs under the Price Fixing and Minimum Fee Agreements with the Maryland Mutual Defendants and the Hawk Mortgage Defendants.

325.    Plaintiffs allege claims pursuant to Fed. R. Civ. P. 23 for violations of 15 U.S.C. § 1 ("Antitrust Class"), with the alleged Antitrust Class defined as:

> All individuals in the United States who were borrowers on a mortgage loan originated or brokered by Maryland Mutual Mortgage, LLC or Hawk Mortgage Company, LLC for which All Star Title, Inc. provided a settlement service, as identified in Section 1100 on the borrower's HUD-1, between January 1, 2010 and December 31, 2017. Exempted from this class is any person who, during the period of January 1, 2010 through December 31, 2017, was an employee, officer, member and/or agent of Maryland Mutual Mortgage, LLC, Hawk Mortgage Company, LLC, or All Star Title, Inc.

326.    The Antitrust Class consists of borrowers on more than 400 loans, and thus are so numerous that joinder of all members is impracticable.

327. There are questions of law and fact common to the claims of each and all members of the Antitrust Class. These common questions include, but are not limited to:

    a. Whether the Maryland Mutual Defendants and the Hawk Mortgage Defendants and their employees and/or agents violated the Sherman Act by conspiring to and fixing the title and settlement services fees charged to and paid by Plaintiffs and Antitrust Class Members;

    b. Whether the Maryland Mutual Defendants and the Hawk Mortgage Defendants and their employees and/or agents violated the Sherman Act by conspiring to and agreeing to supporting the Price Fixing and Minimum Fee Agreements through a concerted refusal to deal with non-cartel title and settlement service companies on all Maryland Mutual and Hawk Mortgage loans generated by the Kickback Agreement;

    c. Whether the prices charged Maryland Mutual and Hawk Mortgage borrowers pursuant to the Cartel Agreements were supracompetitive, and higher than prices that would have been charged without the Cartel Agreements;

    d. Whether the Maryland Mutual Defendants and the Hawk Mortgage Defendants made false representations to borrowers to actively conceal the Cartel Agreements and supracompetitive prices resulting therefrom;

    e. Whether All Star falsely allocated fees to actively conceal the Cartel Agreements and the supracompetitive prices charged Maryland Mutual and Hawk Mortgage borrowers in performance of those agreements;

    f. Whether the Maryland Mutual Defendants and the Hawk Mortgage Defendants made false representations on Maryland Mutual and Hawk Mortgage borrowers'

Good Faith Estimates, HUD-1s and other loan documents to actively conceal the Cartel Agreements and the supracompetitive prices charged Maryland Mutual and Hawk Mortgage borrowers in performance of those agreements;

g.  Whether despite exercising reasonable due diligence, Plaintiffs and Class Members did not and could not have learned of the Cartel Agreements, the supracompetitive prices charged for title and settlement services, and their injuries and actual damages therefrom, until contacted by counsel;

h.  Whether Plaintiffs and the Antitrust Class are entitled to treble damages under the Sherman Act; and

i.  Whether Plaintiffs and the Antitrust Class are entitled to attorneys' fees and expenses under the Sherman Act.

328.  These common issues of law and fact predominate over any question affecting only individual Antitrust Class Members.

329.  Plaintiffs' transactions and claims are typical of the claims or defenses of the respective Antitrust Class Members, and are subject to the same statutory measure of damages set forth in 15 U.S.C. § 15(a).

330.  Plaintiffs will fairly and adequately protect the interests of the Antitrust Class. The interests of the named Plaintiffs and all other members of the Antitrust Class are identical.

331.  Plaintiffs' counsel has substantial experience in complex litigation and class action proceedings, have been approved as class counsel in related litigation, and will adequately represent the Antitrust Class's interests.

332. Separate actions by individual members of the class would create a risk of inconsistent or varying adjudications with respect to individual members of the class that would establish incompatible standards of conduct for the Maryland Mutual Defendants and the Hawk Mortgage Defendants.

333. This action entails questions of law and fact common to Antitrust Class Members that predominate over any questions affecting only individual plaintiffs; therefore, a class action is superior to other available methods of fair and efficient adjudication of this litigation.

334. Most members of the Antitrust Class are unaware of their rights to prosecute a claim against the Maryland Mutual Defendants or the Hawk Mortgage Defendants.

335. No member of the Antitrust Class has a substantial interest in individually controlling the prosecution of a separate action, but if he or she does, he or she may exclude himself or herself from the class upon the receipt of notice under Fed. R. Civ. P. 23(c).

## COUNT III
## Violation of the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1962

336. Plaintiffs incorporate the above stated paragraphs as if restated herein.

337. The Maryland Mutual Defendants and the Hawk Mortgage Defendants are each a "person" as defined under 18 U.S.C. § 1961(3).

338. The Maryland Mutual Defendants, the Hawk Mortgage Defendants, and All Star constitute an enterprise for the purposes of 18 U.S.C. § 1962(a). For a continuous period of at least four years, the Maryland Mutual Defendants, the Hawk Mortgage Defendants, and All Star associate and commit the predicate acts, which acts are separate and in addition to their legitimate mortgage and settlement service operations, for the common

purpose of defrauding borrowers into paying higher and supracompetitive prices for title and settlement services. The activities of the enterprise affect interstate commerce across more than 30 states.

339. The Maryland Mutual Defendants, the Hawk Mortgage Defendants, and All Star perpetrated the All Star Scheme for the purpose of defrauding borrowers into paying fixed and supracompetitive prices for title and settlement services related to Maryland Mutual and Hawk Mortgage residential mortgage, refinance and reverse mortgages, and to thereby deprive borrowers of their money and/or property.

340. The use of the U.S. Mail and interstate wires by the Maryland Mutual Defendants, the Hawk Mortgage Defendants, and All Star in furtherance of the All Star Scheme constitute mail and wire fraud as defined under 18 U.S.C. §§ 1341 and 1343, as pled herein, and service as predicate acts, and constitutes a pattern of racketeering activity as defined under 18 U.S.C. § 1961(5).

341. The Maryland Mutual Defendants and the Hawk Mortgage Defendants received, and continue to receive, income derived from this pattern of racketeering activity in the form of the kickbacks paid by All Star to the Maryland Mutual Defendants and the Hawk Mortgage Defendants, and through the interest, fees and other income earned on the Maryland Mutual and Hawk Mortgage mortgages, refinances and reverse mortgages resulting from the pattern of racketeering activity.

342. The Maryland Mutual Defendants and the Hawk Mortgage Defendants improperly used and invested the income they received from the pattern of racketeering activity in furtherance of the All Star Scheme Enterprise and for the purpose of luring borrowers into the All Star Scheme Enterprise, in violation of 18 U.S.C. § 1962.

343. As a direct and proximate result of the Maryland Mutual Defendants' and the Hawk Mortgage Defendants' pattern of racketeering activity and the All Star Scheme Enterprise, Plaintiffs and Class Members were injured and suffered actual damages in the amount of between $50-950.

344. Plaintiffs allege claims pursuant to Fed. R. Civ. P. 23 for violations of 18 U.S.C. § 1962(a) ("RICO Class"), with the alleged RICO Class defined as:

> All individuals in the United States who were borrowers on a mortgage loan originated or brokered by Maryland Mutual Mortgage, LLC or Hawk Mortgage Company, LLC for which All Star Title, Inc. provided a settlement service, as identified in Section 1100 on the borrower's HUD-1, between January 1, 2010 and December 31, 2017. Exempted from this class is any person who, during the period of January 1, 2010 through December 31, 2017, was an employee, officer, member and/or agent of Maryland Mutual Mortgage, LLC, Hawk Mortgage Company, LLC, or All Star Title, Inc.

345. The RICO Class consists of borrowers on more than 400 loans, and thus are so numerous that joinder of all members is impracticable.

346. There are questions of law and fact common to the claims of each and all members of the RICO Class. These common questions include, but are not limited to:

   a. Whether the Maryland Mutual Defendants and the Hawk Mortgage Defendants and their employees and/or agents violated RICO by defrauding borrowers, including Plaintiffs and RICO Class Members, into paying supracompetitive prices for title and settlement services and fund the kickbacks All Star is paying the Maryland Mutual Defendants and the Hawk Mortgage Defendants;

   b. Whether the Maryland Mutual Defendants, the Hawk Mortgage Defendants, and All Star formed an enterprise;

c.  Whether the activities of the All Star Scheme Enterprise affected interstate commerce;

d.  Whether one purpose of the All Star Scheme was to deprive borrowers of money or property;

e.  Whether the Maryland Mutual Defendants, the Hawk Mortgage Defendants, and All Star used the interstate U.S. Mail in furtherance of the All Star Scheme and All Star Scheme Enterprise;

f.  Whether the Maryland Mutual Defendants, the Hawk Mortgage Defendants, and All Star used the interstate wires in furtherance of the All Star Scheme and the All Star Scheme Enterprise;

g.  Whether the Maryland Mutual Defendants and the Hawk Mortgage Defendants received income from a pattern of racketeering activity;

h.  Whether the Maryland Mutual Defendants and the Hawk Mortgage Defendants used income derived from a patter of racketeering activity in support of, or in furtherance of, the All Star Scheme Enterprise;

i.  Whether the Maryland Mutual Defendants and the Hawk Mortgage Defendants actively conceal the All Star Scheme, the supracompetitive prices, and the All Star Scheme Enterprise;

j.  Whether Plaintiffs' and RICO Class members knew or should have known of their injuries resulting from the Maryland Mutual Defendants' and the Hawk Mortgage Defendants' violation of 18 U.S.C. § 1962(a);

k.  Whether the Maryland Mutual Defendants, the Hawk Mortgage Defendants, and All Star's fraudulent concealments prevented Plaintiffs' and RICO class members

from discovering their injuries proximately caused by the Maryland Mutual Defendants' and the Hawk Mortgage Defendants' pattern of racketeering activity;

l.  Whether Plaintiffs and the RICO Class are entitled to treble damages pursuant to 18 U.S.C. § 1964(c); and

m.  Whether Plaintiffs and the RICO Class are entitled to attorneys' fees and expenses pursuant to 18 U.S.C. § 1964(c).

347.  These common issues of law and fact predominate over any question affecting only individual RICO Class Members.

348.  Plaintiffs' transaction and claims are typical of the claims or defenses of the respective RICO Class Members, and are subject to the same statutory measure of damages set forth in 18 U.S.C. § 1964(c).

349.  Plaintiffs will fairly and adequately protect the interests of the RICO Class. The interests of the named Plaintiffs and all other members of the RICO Class are identical.

350.  Plaintiffs' counsel has substantial experience in complex litigation and class action proceedings, have been approved as class counsel in related litigation, and will adequately represent the RICO Class's interests.

351.  Separate actions by individual members of the class would create a risk of inconsistent or varying adjudications with respect to individual members of the class that would establish incompatible standards of conduct for the Maryland Mutual Defendants and the Hawk Mortgage Defendants.

352.  This action entails questions of law and fact common to RICO Class Members that predominate over any questions affecting only individual plaintiffs; therefore, a class

action is superior to other available methods of fair and efficient adjudication of this litigation.

353. Most members of the RICO Class are unaware of their rights to prosecute a claim against the Maryland Mutual Defendants or the Hawk Mortgage Defendants.

354. No member of the RICO Class has a substantial interest in individually controlling the prosecution of a separate action, but if he or she does, he or she may exclude himself or herself from the class upon the receipt of notice under Fed. R. Civ. P. 23(c).

**WHEREFORE**, Plaintiffs respectfully demand:

a. This Court to certify the RESPA, Antitrust, and RICO Classes pursuant to Federal Rule of Civil Procedure 23 and set this matter for trial;

b. Judgment for Plaintiffs and RESPA Members against Maryland Mutual Mortgage, LLC, Hawk Mortgage Company, LLC, Corey J. Anderson, and Jeffery T. Hawk jointly and severally as permitted by law and award Plaintiffs and RESPA Class Members treble damages for title and settlement services charged by All Star, including, but not limited to, title insurance premiums, in an amount equal to three times the amount of any charge paid for such settlement services, pursuant to 12 U.S.C. § 2607(d)(2);

c. Judgment for Plaintiffs and Antitrust Class Members against Maryland Mutual Mortgage, LLC, Hawk Mortgage Company, LLC, Corey J. Anderson, and Jeffery T. Hawk jointly and severally as permitted by law and award Plaintiffs and Antitrust Class Members damages in the amount equal to three times the actual damages caused by the Cartel Agreements pursuant to 15 U.S.C. § 15(a);

d. Judgment for Plaintiffs and RICO Class Members against Maryland Mutual Mortgage, LLC, Hawk Mortgage Company, LLC, Corey J. Anderson, and Jeffery T. Hawk jointly and severally as permitted by law and award Plaintiffs and RICO Class Members damages in the amount equal to three times the actual damages caused by the Maryland Mutual Defendants' and the Hawk Mortgage Defendants' pattern of racketeering activity pursuant to 18 U.S.C. § 1964(c);

e. Reasonable attorneys' fees, interest and costs pursuant to 12 U.S.C. § 2607(d)(5), 15 U.S.C. § 15(a), and 18 U.S.C. § 1964(c); and

f. For such other and further relief as this Court deems proper.

Respectfully submitted,

_____/s/_____          _____/s/_____
Timothy F. Maloney, Esq. #03381          Michael Paul Smith, Esq. #23685
Veronica B. Nannis, Esq. #15679          Melissa L. English, Esq. #19864
Megan A. Benevento, Esq. #19883          Sarah A. Zadrozny, Esq. #13911
Joseph, Greenwald & Laake, P.A.          Smith, Gildea & Schmidt, LLC
6404 Ivy Lane, Suite 400          600 Washington Avenue, Suite 200
Greenbelt, Maryland 20770          Towson, Maryland 21204
(301) 220-2200 / (301) 220-1214 (fax)          (410) 821-0070 / (410) 821-0071 (fax)
Email: tmaloney@jgllaw.com          Email: mpsmith@sgs-law.com
vnannis@jgllaw.com          menglish@sgs-law.com
mbenevento@jgllaw.com          szadrozny@sgs-law.com
*Co-Counsel for Plaintiffs and Class Members*          *Counsel for Plaintiffs and Class Members*

## **PRAYER FOR JURY TRIAL**

Plaintiffs and Class Members hereby request a trial by jury on the foregoing Class Action

Complaint.

| | |
|---|---|
| _____/s/_____ | _____/s/_____ |
| Timothy F. Maloney, Esq. #03381 | Michael Paul Smith, Esq. #23685 |
| Veronica B. Nannis, Esq. #15679 | Melissa L. English, Esq. #19864 |
| Megan A. Benevento, Esq. #19883 | Sarah A. Zadrozny, Esq. #13911 |
| Joseph, Greenwald & Laake, P.A. | Smith, Gildea & Schmidt, LLC |
| 6404 Ivy Lane, Suite 400 | 600 Washington Avenue, Suite 200 |
| Greenbelt, Maryland 20770 | Towson, Maryland 21204 |
| (301) 220-2200 / (301) 220-1214 (fax) | (410) 821-0070 / (410) 821-0071 (fax) |
| Email: tmaloney@jgllaw.com | Email: mpsmith@sgs-law.com |
| vnannis@jgllaw.com | menglish@sgs-law.com |
| mbenevento@jgllaw.com | szadrozny@sgs-law.com |
| *Co-Counsel for Plaintiffs and Class Members* | *Counsel for Plaintiffs and Class Members* |